**BOSTON MOLASSES CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 4073.

Circuit Court of Appeals, First Circuit.

April 17, 1946.

Bernard E. Brandes, of New York City (Morton L. Deitch and Stroock & Stroock & Lavan, all of New York City, of Counsel), for petitioner for review.

S. Dee Hanson, Sp. Asst. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., and J. P. Wenchel, Chief Counsel, and John M. Morawski, Sp. Atty., Bureau of Internal Revenue, both of Washington, D.C., for Commissioner.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is a petition for review of a decision of the Tax Court of the United States assessing a deficiency of $3,522.83 in the petitioner's income tax for its fiscal year ending June 30, 1941. The question presented is whether under § 23(f) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 23(f),[1] the taxpayer may deduct $14,668.35, the unrecovered balance of the cost of a certain bulkhead[2] which it had erected on Reserve Channel in Boston Harbor in 1917, on the ground that it had abandoned that bulkhead during the tax year in question.

---

[1] "Sec. 23. Deductions from gross income. * * *

"(f) Losses by corporations. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

[2] The taxpayer's expert witness testified: "A bulkhead consists of a series of wooden piles—I am going to describe a wooden bulkhead which was the particular bulkhead at this time—a series of wooden piles driven down in a row at possibly five foot intervals and these piles are joined together by heavy cross timbers which makes a very solid timber structure which holds back the land on one side and water on the opposite side, and there are either piles driven down into the land or driven down into the water on either side to take any lateral thrust that may develop."

The facts found by the Tax Court are not challenged and since its opinion is not reported we quote them verbatim:

"The petitioner is engaged in the business of manufacturing and selling molasses. Raw molasses is imported and delivered to it by tank steamers which require dockage facilities at or near its place of business. The raw molasses is pumped from the steamers through pipe lines into large steel storage tanks on the land adjoining petitioner's plant. Since a gallon of molasses weighs 12 pounds, these tanks create tremendous pressure upon the earth. Petitioner erected before 1917 a plant near Boston Harbor in South Boston, on land owned by the United States and the Commonwealth of Massachusetts, which was leased by petitioner on the understanding that upon sixty days' notice by the Federal Government, petitioner should vacate the land. On September 24, 1940, the Federal Government gave notice to petitioner to vacate the land. In 1917 petitioner had purchased land about three miles distant from its plant and on a body of water known as Reserve Channel. This land was acquired as a site for its plant and heavy equipment in the event the Federal Government should terminate its lease to petitioner, as at that time seemed likely because of the war. About the year 1922 petitioner erected at a cost of $37,853.92 a bulkhead between the water and the Reserve Channel land it had purchased to hold back the land on one side and the water on the other. Since petitioner intended to use the adjoining land for its plant and heavy equipment in the contingency mentioned, the bulkhead was made proportionately strong.

"When the petitioner received notice from the United States in September, 1940 to vacate the leased land, it sent an engineer employed by its parent company to examine the bulkhead on the Reserve Channel land. He found it to be in very poor condition, the timbers rotted and attacked by a marine worm; the water having penetrated on the north end some 30 or 40 feet. He reached the conclusion that the bulkhead in such a condition would not support the weight of petitioner's plant and heavy equipment if removed to petitioner's land. The engineer called into consultation a Boston firm of engineers and the dockbuilders' firm which had built the bulkhead, and the opinion of both confirmed his own. Petitioner did not keep the bulkhead in proper repair and its condition in 1940, therefore, was the result of gradual decay. To put the bulkhead in a condition to support the necessary operational equipment, the engineer concluded that it would require an expenditure of between $35,000 and $40,000, and he did not consider it economically sound for petitioner to make such an expenditure. Having reached this conclusion, the engineer sought to find a suitable place in Boston harbor or Charlestown for petitioner's dock, and finally concluded an arrangement with the White Fuel Corporation which owned land adjoining petitioner's Reserve Channel land.

"On February 14, 1941, petitioner transferred the bulkhead and part of its adjoining land to the White Fuel Corporation in exchange for the right to use for twenty-five years the wharf and dockage facilities and certain rights of way over the land of that corporation. After the transfer, petitioner erected large tanks on a portion of the Reserve Channel land retained by it. This necessitated a restoration to adequate strength of a portion of the bulkhead which had been transferred to the White Fuel Corporation, the expense of which was borne by both corporations. The Commonwealth of Massachusetts had refused a permit to petitioner to erect its largest tank, of 1,800,000 gallons capacity, until the bulkhead immediate to the land on which it would be built should be erected, and the new work consisted in installing sheet-steel piling in the room of part of the old bulkhead here in question.

"From 1923 to 1941 petitioner claimed and was allowed depreciation on the bulkhead in its income tax returns and at the time of the transfer of the bulkhead to the White Fuel Corporation on February 14, 1941, its undepreciated cost was $14,668.35. The rate of depreciation allowed was 5 per cent until 1930, and thereafter only 2 per cent."

The petitioner taxpayer contends that the Tax Court erred in failing to hold as a matter of law that on these facts it abandoned its bulkhead during its tax year ending on June 30, 1941. We do not agree.

Section 23(f) is, of course, very broad and general in its terms. Obviously, however, it was not intended to include in this subsection deductions permitted by other paragraphs of the section, such for instance as the deduction of "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence" permitted by § 23(l). In addition

§ 23(f) is given clarity of outline by Treasury Regulations 103, which "have the effect of law" under the rule of Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52, Sec. 19.23(e)—3 of which is pertinent and so far as material is quoted in the margin.[3] See S. S. White Dental Mfg. Co. v. United States, '55 F.Supp. 117, 120, 121, 102 Ct.Cl. 115.

This regulation defines the scope of the deduction permitted for the "abandonment" of property, so called. The idea expressed in it is not readily captured in words. Nevertheless its content becomes clear when it is kept in mind that the deduction for abandonment does not overlap deductions allowed for other reasons, and when the elements required for abandonment are listed. These elements are (1) that the property be permanently discarded from use in the taxpayer's business (2) that it be no longer useful in the taxpayer's business, and (3) that its usefulness in the taxpayer's business suddenly terminated because of some unforeseen change in business conditions. Conceding that the first two elements are present in the case at bar; the third is lacking.

The taxpayer here permanently discarded the bulkhead from use in its business. In fact it exchanged it for other property in a swap with another corporation. Also the bulkhead was no longer useful in the taxpayer's business. It ceased to provide sufficient support for the taxpayer's land for the use it wanted to make of that land. And these events, we may concede for present purposes, occurred in the tax year in question. But even if it could be said that the bulkhead's usefulness in the taxpayer's business terminated "suddenly", (a point we leave undecided) it cannot be said on the facts as found that its usefulness terminated be reason of some unforeseen change in business conditions.

The facts certainly do not indicate that the taxpayer had no more use in its business for some sort of a bulkhead on its Reserve Channel property. On the contrary the facts show that in 1940 it suddenly had great and immediate use for an adequate structure of that sort on that property. What the facts show is that when the taxpayer, for business reasons, wanted to make use of its bulkhead, it found that the bulkhead it had previously built was no longer of any use for the purpose it was meant to serve. That is, the facts indicate not that the taxpayer no longer had any use for its bulkhead, but that, having an immediate and pressing use for it, it found its bulkhead no longer usable because of gradual decay accelerated by the attack of marine worms. The fact that after this discovery it discarded the bulkhead, if it did do that instead of exchanging it, plus land of undisclosed value, for certain rights of a con-

---

[3] "Sec. 19.23(e)—3. Loss of useful value. When through some change in business conditions, the usefulness in the business of some or all of the captial assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in section 113(b) and sections 19.113 (a) (14)—1 and 19.113 (b) (1)—1 to 19.-113 (b) (3)—2, inclusive) and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property termi-

nates solely as a result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories or to other than capital assets. The exception applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. Any loss to be deductible under this exception must be fully explained in the return of income. The limitations provided in section 117 with respect to the sale or exchange of capital assets have no application to losses due to the discarding of capital assets.

* * * * * * * *

"Sec. 19.23 (f)—1. Losses by corporations. Losses sustained by domestic corporations during the taxable year and not compensated for by insurance or otherwise are deductible insofar as not prohibited or limited by sections 23 (g), 23 (h), 24 (b), 112, 117, 118, and 251. The provisions of sections 19.23(e)—1 to 19.23(e)—5, inclusive, and section 19.23 (i)—1 are in general applicable to corporations as well as individuals. * * * "

tractual nature, also of undisclosed value, as the Tax Court held, has no bearing. One cannot permanently discard a worn out or obsolete piece of property from use in one's business and then claim a deduction for abandonment without confusing the deduction for depreciation or obsolescence under § 23(*l*) with the deduction for abandonment under 23(f). This is made abundantly clear by the provision of the Regulations supra, that "This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized."

The decision of the Tax Court is affirmed.