COMMISSIONER OF INTERNAL REVENUE v. GILT EDGE TEXTILE CORPORATION et al.

No. 9653.

United States Court of Appeals
Third Circuit.

Argued Nov. 18, 1948.

Decided March 14, 1949.

Fred E. Youngman, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., and Ellis N. Slack and Robert N. Anderson Sp. Assts. to Atty. Gen., on the brief), for petitioner.

George Surosky, of Paterson, N. J. (Surosky & Surosky, of Paterson, N. J., on the brief), for respondent.

Before BIGGS, Chief Judge, and GOODRICH and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

The instant appeal poses the question whether a $30,000 payment made in 1942 by Gilt Edge Textile Corporation ("Gilt Edge"), the taxpayer, to one Philip Dimond, who was its president, treasurer, a director, and the majority stockholder, is deductible from its gross income under the provisions of Section 23(f) of the Internal Revenue Code, 26 U.S.C.A. § 23(f).

The facts are substantially as follows: One Louis Spitz, a business associate of Dimond in the Quackenbush Company, died in 1929. Dimond became one of the three executors of Spitz' estate, estimated to be about $2,600,000. About 4½ months thereafter, Gilt Edge lent $30,000 to the estate, in return for a note payable one month from date. At maturity, the note was supplanted by another, payable on demand, on which interest was paid from time to time. The record before us does not disclose whether or not the making of an unsecured loan was within the corporate powers of Gilt Edge, nor what part Dimond played in the arrangements.

About the middle of February, 1931, a time when the estate was experiencing financial difficulties, an agreement was consummated, wherein (a) Gilt Edge paid to the estate $91,927.50, (b) there was transferred to Gilt Edge 1313¼ shares of the capital stock of Quebest Investing Company, the capital stock of which had been owned at Spitz' death by members of the Spitz family (82½%) and Dimond (17½%) and (c) the estate gave Gilt Edge a check for $31,140, in payment of the demand note and accrued interest.

In 1938, the youngest son of Spitz filed against Dimond in a New Jersey chancery court a bill of complaint which asserted five causes of action. In general, Dimond was accused of various acts of mismanagement in his capacity as executor. The first cause of action is here relevant. As later amended, it alleged that the 1931 Quebest transaction, outlined above, was in breach of trust and constituted a preferential payment.

Subsequently, the widow and other children of Spitz joined as complainants in the New Jersey suit and added a sixth cause of action. Although not made a party defendant in that suit during the four years it was pending, Gilt Edge appointed counsel

to represent its interests because it was averred in the complaint that Gilt Edge had gained. Dimond retained other counsel in his defense.

On July 31, 1942, pursuant to a stipulation in settlement between the Spitz family and Dimond, the chancery court entered a final decree. The terms, inter alia, called for (a) the payment of $100,000 to the estate by Dimond, $30,000 of which was "* * * by way of return to the Estate of Louis Spitz, deceased, of, and in payment of any liability by reason of, the allegedly preferential repayment by defendant [Dimond] as Executor, in February, 1931, of a loan to the Estate in that amount * * *," (b) the dismissal of the first cause of action with prejudice, (c) the execution of general releases, by the complainants individually and the executors of the estate, in favor of Dimond and Gilt Edge, (d) like execution of a release by Gilt Edge and one by Dimond in favor of those complainants and the estate. Signatures in consent to the making and entry of the decree were affixed by those complainants and their counsel and by Dimond and his individual counsel, but not by a representative of Gilt Edge or its counsel.

One day prior to this decree, Gilt Edge gave Dimond a certified check in the sum of $30,000. On the face of the check was the notation, "Repayment of preference to the Estate of Louis Spitz et alli [sic]." In its 1942 income tax return, Gilt Edge claimed a deduction therefor, which the Commissioner disallowed.

The Tax Court, five judges dissenting, held that Gilt Edge could deduct this payment under the provisions of 26 U.S.C.A. § 23(f), which reads: "(f) Losses by corporations. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise." The opinion of the Tax Court is reported at 9 T.C. 543 (1947).

■ Preliminarily, it is important to note that, through the years, it has become accepted doctrine that this statutory provision, as well as its precursors, has a fixed scope of applicability. Thus, in Spring City Foundry Co. v. Commissioner, 1934, 292 U.S. 182, 189, 54 S.Ct. 644, 78 L.Ed. 1200, the Supreme Court of the United States held that a similar provision in the Revenue Act of 1918, 40 Stat. 1057, did not permit deduction of a partially worthless debt, when another subdivision provided for the deduction of worthless debts. Likewise, in Boston Molasses Co. v. Commissioner, 1 Cir., 1946, 155 F.2d 45, 46, the court explained that "it was not intended to include in this subsection [§ 23(f)] deductions permitted by other paragraphs of the section * * *." Even more specifically, the court in Hales-Mullaly v. Commissioner, 10 Cir., 1942, 131 F. 2d 509, 512, citing Kornhauser v. United States, 1928, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505, held that "expenditures made in the compromise of litigation and for attorneys fees and other expenses in connection with the litigation do not come within the ambit of" Section 23(f). With this background, we may analyze the decision of the Tax Court in the instant case.

■ First, the majority of the Tax Court spoke of the possibility that Gilt Edge might well "have been legally compelled to make direct restitution to the estate." No authority is cited in support of that concept. On the basis of the record before the Tax Court, we cannot agree with that inference. In the four years that the chancery suit was pending, none of the Spitz family saw fit to attempt to proceed against Gilt Edge. If a payment in compromise of litigation already instituted against oneself is not deductible under Section 23(f), see Hales-Mullaly v. Commissioner, supra, we think it follows a fortiori that Gilt Edge cannot claim a deduction under that section when the litigation is directed against a third person and Gilt Edge has not been made a party defendant for so long a period of time.

■ Next, the majority of the Tax Court found "considerable merit in the contention" that Gilt Edge "was legally obligated to reimburse Dimond for his loss when it later developed that he was answerable to the estate for the money he had collected for petitioner's [Gilt Edge] benefit." Thus, the majority of the Tax Court reasoned that, since Gilt Edge apparently benefited by the 1931 Quebest transaction,

and since Dimond was compelled to return the $30,000 to the estate, Gilt Edge was legally obligated to indemnify Dimond. Analysis of the record before us, however, reveals fatal defects in that approach. In the first place, it assumed that Gilt Edge would have no valid defense to a claim by Dimond for reimbursement, despite the doubts engendered whether the 1929 unsecured loan of Gilt Edge, to an estate of which its president and majority stockholder was an executor, was in breach of Dimond's duty, and whether failure to proceed on the demand note for more than a year was neglect chargeable to Dimond. Secondly, both the bill of complaint in the New Jersey court, which Gilt Edge introduced in evidence, and testimony adduced in the Tax Court indicate that Dimond was the inspirer of the 1931 Quebest transaction, and that his prime purpose was to acquire for himself the Quebest stock, rather than to obtain on behalf of Gilt Edge repayment of the loan; in short, Dimond was not acting as agent or officer of Gilt Edge in negotiating the deal although, as officer, he did cause Gilt Edge to agree to a purchase which incidentally enabled Gilt Edge to recover the $30,000.

Thirdly, the evidence as to benefit to Gilt Edge leaves much to be desired. The record gives no indication of the fair value of the Quebest stock in 1931, other than the price paid by Gilt Edge at that time. Since Dimond, in control of Gilt Edge by virtue of his offices and stock ownership, was at the same time negotiating as well in his personal interest and as executor of the estate, the record which Gilt Edge has made does not dispose of the possibility that Gilt Edge in fact not only paid more than the fair value of the Quebest stock, but also thereby acquired an asset of dubious marketability.[1]

Fourthly, it must be noted that, if the 1931 transaction was actually a preference, and if, by some theory akin to following the res, the estate could have compelled Gilt Edge to return the $30,000 paid Gilt Edge in 1931, such refunding would have put Gilt Edge in the status of a general creditor of the estate; and, there being no evidence that the estate was at any time completely without assets, Gilt Edge would have been able to recover some portion at least, if not all, of the $30,000.[2] Even if Dimond had acted as agent of Gilt Edge in 1931, therefore, he certainly did not in 1942, when he released all claims against the estate; and Gilt Edge, by giving Dimond $30,000 and signing the release, effectually deprived itself of whatever amount it could have regained from the estate.

■ The foregoing considerations become cogent when it is remembered that the burden of proving the Commissioner's determination to be wrong lay upon Gilt Edge. The record before the Tax Court and before us totally fails to overcome the presumption in favor of the deficiency assessment, if the basis of the decision is to be some legal obligation of Gilt Edge as a principal.

■ The final ground of the majority of the Tax Court—that on which primary reliance apparently was placed—was the belief that "even a moral obligation, arising out of a business transaction, will support a loss deduction," citing as authority appeal of Herschel V. Jones, 1925, 1 B.T.A. 1226, and Abraham Greenspon v. Commissioner, 1947, 8 T.C. 431. We need not determine the validity of this doctrine,[3] for, as we

---

[1] The Quebest stock, it will be recalled, was closely held. The record does indicate that the stock later appreciated in value; and Gilt Edge has stated that Dimond purchased most of this stock from Gilt Edge at an unspecified date.

[2] It is not inapposite to point out the unlikelihood of the beneficiaries suing Dimond, if the net assets of the estate were insufficient to meet its obligations to its creditors.

[3] We note that Appeal of Herschel V. Jones, 1925, 1 B.T.A. 1226, which cites no precedent for its conclusion, was in-

ferentially rejected in Goldsborough v. Burnet, 4 Cir., 1931, 46 F.2d 432, and that Abraham Greenspon v. Commissioner, 1947, 8 T.C. 431, besides being distinguishable from the question sub judice, likewise offers a paucity of persuasive precedent. Cf. the following cases as examples of the oft-announced principle that, while discharge of a moral obligation may be laudable, Section 23(f) of the Internal Revenue Code does not permit a tax deduction therefor: Robinson v. Commissioner, 8 Cir., 1931, 53 F.2d 810, 811, 79 A.L.R. 975; Sam P. Wallingford

have indicated above, the facts of the case at bar hardly spell out a situation warranting the invoking of such a rule. Even were it true that the 1931 transaction constituted a preferential payment to Gilt Edge—and we are advised of no legal action by any creditor of the estate asserting that claim—the worst that Gilt Edge could suffer in the event of an adverse judicial determination was the nullification of the transaction and the resumption by Gilt Edge of its status as a general creditor of the estate. We reiterate that there was a total absence of evidence that Gilt Edge, as a general creditor, could not then have recovered some measure, or all, of the $30,000 owed, between 1938 and 1942. Instead, as the result of an agreement to which Gilt Edge was not signatory, Gilt Edge not only voluntarily gave Dimond $30,000 but also, in executing a release which eliminated its rights against the estate, performed an act from which it could not possibly benefit. If Gilt Edge had an obligation, we think it was to defend against the attack upon the 1931 transaction or, in the alternative, to proceed against the estate on the debt which the estate had owed since 1929. The conclusion is irresistible that what Gilt Edge did in 1942 was to make a gift of $30,000 to its president-majority stockholder for his sole benefit, and that consequently no moral obligation existed.

As we stated in Commissioner of Internal Revenue, v. Estate of Cardeza, 3 Cir., 1949, 173 F.2d 19, the legislative abrogation of the so-called "Dobson doctrine" applies to appeals pending when the statutory modification became effective. See also Wright-Bernet, Inc. v. Commissioner, 6 Cir., 1949, 172 F.2d 343. Under the rule formerly obtaining, we would nevertheless here reach the same result, since there was no substantial basis for the finding of the Tax Court. Cf. Hatfried v. Commissioner, 3 Cir., 1947, 162 F.2d 628, and In re Leuders' Estate, 3 Cir., 1947, 164 F.2d 128.

For the reasons stated, the decision of the Tax Court must be reversed.

---

Grain Corp. v. Commissioner, 10 Cir., 1934, 74 F.2d 453, 454; and Friedman v. Delaney, 1 Cir., 1948, 171 F.2d 269, 271.