Thomas A. WALSH, Jr., and Marjorie C. Walsh, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 0302.

United States District Court
D. Nebraska.

July 15, 1958.

422

Robert D. Mullin, Omaha, Neb., for plaintiffs.

Deane E. McCormick, Jr., Dept. of Justice, Washington, D. C., and Robert H. Berkshire, Asst. U. S. Atty., Omaha, Neb., for defendant.

ROBINSON, Chief Judge.

This is an action to recover income taxes assessed and collected for the calendar year 1950 in the amount of $2,776.05. The issue raised is whether the property of the partnership of which the taxpayer Marjorie C. Walsh was a member was abandoned in 1950 within the meaning of Section 23(e), Title 26 U.S.C.A., Internal Revenue Code of 1939. The taxpayer contends that the loss from abandonment did not occur until, and therefore cannot properly be claimed before, that year. On the other hand, the Internal Revenue Service has ruled that it must be taken in 1948.

The facts briefly are these: The Nebs Company was a partnership comprised of the taxpayer (Thomas A. Walsh, Jr., her husband, is named in this action solely because a joint return was filed), Niel N. Dungan, and James H. Matthews. The Company, about October, 1946, began manufacturing corn chips, a food product similar, we are told, to fritos now on the market. The principal ingredients of corn chips were corn and corn oil. The cost of these commodities continually rose in the postwar period following the removal of price controls until, by late 1947, corn chips could no longer be profitably produced. After experiments with cheaper ingredients proved unsatisfactory, the Nebs Company ceased manufacturing and the product was not sold in 1948 or at any later time.

The building occupied by this enterprise was sold in December, 1947. Certain non-essential equipment, including a bag-sealer considered unsuitable in future operations, was advertised for sale and eventually disposed of. All of the essential machinery for the manufacture of the product (including the equipment which had been designed and built to specifications) was originally placed in storage in a building located at 10th and Douglas Streets, Omaha, Nebraska. Later in 1948 it was moved to a warehouse at 38th and Farnam Streets, also in the same city, owned by the Thomas A. Walsh Manufacturing Company. There the equipment was placed in position for wiring but was not prepared for immediate operation as it was believed this expense should not be undertaken until it appeared feasible to resume manufacturing. Nevertheless, a loading dock was constructed and a new overhead door was installed in the building preliminary to such operation, at the expense of the owner.

During the early months of 1950 the Walsh Manufacturing Company decided to sell its building. The Nebs Company was then faced with the problem of resuming business at a new location under still adverse conditions, finding new storage facilities, or selling the equipment

and wholly abandoning the enterprise. The third alternative was chosen but extensive efforts to sell the equipment met with disappointing results. Only the amount of $219 was realized from the sale of a few items at far below their value and the balance of the equipment was thereupon scrapped. A used metal company agreed to haul it away upon being permitted to keep the salvage.

Also during the spring or early summer of 1950 the personal tax returns of the taxpayer and her husband for prior years were given a routine audit by a revenue agent. Upon learning that the Nebs Company had never filed a partnership return for 1948, he suggested that a delinquent return promptly be filed. He likewise indicated than an abandonment loss covering the Nebs equipment should be taken in 1948. Following the agent's suggestion, the taxpayer filed a delinquent 1948 partnership return for the Nebs Company on July 25, 1950. She also amended her 1948 individual return, claiming the loss on the abandoned property in that year to the full extent of the adjusted basis of the property as of January 1, 1948. The amount was allowed in full by the Internal Revenue Service in computing the adjustments to the taxpayer's return. The loss was only effective in offsetting a small amount of income but, irrespective of the allowed abandonment loss, no

tax would have been due from the taxpayer for the calendar year of 1948.

Early in 1951 the taxpayer's accountant questioned the propriety of her deducting a loss from abandonment in 1948 and, upon his advice, she filed on January 15, 1951, an amended partnership return for the Nebs Company for 1948 in which the previously claimed loss was omitted. A final return for the Company for 1950 was filed reflecting the loss, less the $219 received for the sale of miscellaneous equipment. In her joint return for 1950 the taxpayer's share of the loss (50%) was also claimed. The Internal Revenue Service disallowed the deduction for that year and assessed a deficiency. After an unsuccessful protest, the taxpayer paid the deficiency and filed a claim for refund. When this claim was disallowed, she instituted the present action.

■■ The applicable statute and tax regulation are set out in a footnote.[1] Section 23(e) of the 1939 Internal Revenue Code provides that in computing net income for tax purposes there shall be allowed as deductions "losses sustained during the taxable year and not compensated for by insurance or otherwise". Treasury regulation III Sec. 29.23(e) has amplified this provision by prescribing that deductible losses "must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and

---

[1]. Internal Revenue Code of 1939:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(e) *Losses by individuals.* In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or \* \*".

(26 U.S.C.A. § 23)

Treasury Regulation 111, promulgated under the Internal Revenue Code of 1939:

Sec. 29.23(e)–1 Losses by Individuals Losses sustained by individual citizens

or residents of the United States and not compensated for by insurance or otherwise are fully deductible if (1) incurred in the taxpayer's trade or business, or (2) incurred in any transaction entered into for profit,

\* \* \* \* \*

In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. Full consideration must be given to any salvage value and to any insurance or other compensation received in determining the amount of losses actually sustained. \* \*

actually sustained during the taxable period for which allowed". As the Supreme Court said in Boehm v. Commissioner, 326 U.S. 287, 292, 66 S.Ct. 120, 123, 90 L.Ed. 78, "[s]uch unmistakable phraseology compels the conclusion that a loss, to be deductible under § 23(e) [2] must have been sustained *in fact* during the taxable year. * * * The standard for determining the year for deduction of a loss is thus a flexible, practical one, varying according to the circumstances of each case." Whether the physical abandonment of the machinery marked the actual abandonment of the enterprise so as to entitle the taxpayer to a deduction for the loss in 1950 is essentially a question of fact and the burden is upon the taxpayer to prove that the loss is deductible in that year. Meyer v. Commissioner, 8 Cir., 243 F.2d 262, 264.

■ We are persuaded that the taxpayer has sustained her burden. Abandonment must be evidenced by some "affirmative act", Helvering v. Jones, 8 Cir., 120 F.2d 828, 830. The scrapping of machinery in 1950 would comprise the requisite transaction, the disposition being the "identifiable event" indicating the abandonment of the enterprise. A careful review of the testimony reveals nothing to show that the loss was "bona fide and actually sustained" before then. The government contends that the act of abandonment is not always the identifiable event which establishes the abandonment loss. Treasury regulation III, Sec. 29.23(e)–3, provides that "when, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted * * *) and the salvage value". However, we fail to see how this exception to

the general rule is appropriate in the present situation.

■ It must be borne in mind that the Nebs Company began manufacturing in October, 1946, after an investment of several thousands of dollars by the partners in machinery specially designed and built to specifications. It discontinued manufacturing about December, 1947, which meant, in effect, that the Company was in operation a little more than a year. We search in vain for evidence establishing that the machinery was discarded at the time the operation was suspended. True, a few of the non-essential items were sold at the time, but all of the essential equipment was retained, moved from place to place, and kept ready for use. The only reason the machinery was not used was that market prices of the necessary raw materials presently made the operation unfeasible. But there was no indication that the equipment had permanently lost its usefulness, justifying its being prematurely discarded. Quite the contrary, the machinery (at least, all save a few items) was preserved and even placed in position for eventual operation. There is ample evidence showing that the taxpayer continued to believe that the operation would ultimately be resumed. Investigations were made into different packaging machines and improvements were undertaken on the building in which the equipment was finally stored, to recite some examples. And considering the factor which compelled the cessation of operation, it is hardly reasonable to conclude that the enterprise was abandoned at the time it discontinued manufacturing. We believe the taxpayer is correct in maintaining that the enterprise was not abandoned until the necessary machinery was scrapped. The identifiable event was the scrapping. Cf., Davis v. Commissioner, 7 Cir., 241 F.2d 701, 703.

A case highly pertinent and practically controlling in our present issue is Ewald

2. The Court had reference to Section 23 (e) of the 1936 Revenue Act, which differed, however, in no material respect from its counterpart in the 1939 Act presently under consideration.

Iron Company v. Commissioner, 37 B.T.A. 798. There the taxpayer discontinued the manufacture of drilled staybolts, primarily for the reason that under existing economic conditions, the business was being operated at a loss. The taxpayer did not scrap the bolt machines, but stored them where they were available at any time for resumption of operations. The taxpayer, however, deducted the value of the equipment as an abandonment loss in the year in which its use was discontinued and the equipment stored (the converse of our situation). The Tax Court held that the evidence was wholly insufficient to show an act of abandonment. "While abandonment necessarily involves nonuse, proof of nonuse is not sufficient to constitute abandonment. * * * The necessary machinery was on hand and * * * [the petitioner could have resumed manufacturing] at any time. * * * We think petitioner has not shown any loss of useful value", at pages 799, 800. See also W. B. Davis & Son, Inc. v. Commissioner, 5 T.C. 1195, 1219; Wilson Line, Inc. v. Commissioner, 8 T.C. 394, 399; and Becker v. Anheuser-Busch, Inc., 8 Cir., 120 F.2d 403, 417.

■ The government has argued that the taxpayer filed a partnership return claiming the loss in 1948, thus indicating her original belief that the property was abandoned in that year and, furthermore, signifying that her subsequent change of the claimed 1948 abandonment loss was entirely motivated by a monetary consideration. This argument has no substance. The facts demonstrate that a revenue agent first suggested a delinquent return for the partnership and that at the time no attention was seriously paid to the matter. Moreover, the question was not raised until 1950, the taxpayer having made no claim for any loss before then. It also develops that, when originally made, the claim had no effect of reducing a tax liability while it successfully precluded the taxpayer's receiving the benefit of the loss in any other year. But whether or not the claim would have effected the tax liability, in our opinion the deduction for 1948 was erroneous and should not have been allowed. We therefore disregard this argument.

■ As expressed in Boston Molasses Co. v. Commissioner, 1 Cir., 155 F.2d 45, 47, the idea of abandonment is not readily captured in words. The regulation has set forth rough guideposts which are helpful primarily because the issue requires a practical approach. From a consideration of all the evidence, we are impelled to conclude that the taxpayer was far from an "incorrigible optimist" when she expected and even planned for an eventual resumption of her partnership business. There is every indication that the taxpayer did intend to resume operation whenever the price of raw materials would permit. And while the taxpayer's beliefs and actions do not govern, neither should they be ignored, Boehm v. Commissioner, supra, 326 U.S. at page 293, 66 S.Ct. 120. We find and so hold that the partnership, practically in its infancy when it suspended operation, was not abandoned until its essential equipment had been scrapped in 1950. Until then the dormant enterprise retained its capacity to resume operation with little delay had the taxpayer so desired.

■ A second proposition, the failure of the taxpayer to show the amount of the loss, was raised and argued by the government for the first time in its post-trial brief. The burden of the taxpayer, as cited under this proposition, is, however, limited to the issues present at the time of trial. We find no obligation to answer arguments subsequently raised, and to adopt this course would, in our judgment, render pleadings useless and impose an intolerable burden upon the plaintiff. The taxpayer did put in evidence the value of the machinery at the time it was scrapped and that was the only evidence introduced upon the subject. As this question was not hitherto raised and the taxpayer had otherwise sustained her burden, we are not at this late date required, nor do we feel inclined, to examine the matter further.

426

Judgment will be for the plaintiffs. This memorandum will serve as the findings of fact and conclusions of law unless counsel request otherwise. Counsel for the plaintiffs will prepare and submit a suitable order reflecting the judgment herein within twenty (20) days.