READE MANUFACTURING COMPANY, Inc., a corporation of the State of New Jersey, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 286–60.

United States District Court
D. New Jersey.

April 6, 1961.

William Boorstein, Bayonne, N. J., for plaintiff.

Chester A. Weidenburner, U. S. Atty., Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., Daniel M. Dwyer, Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

MEANEY, District Judge.

This is a suit for the recovery of income taxes for the years 1954 and 1955, with interest, aggregating approximately $18,500. The facts have been agreed upon and are contained in the stipulation submitted to the court, a photostatic copy of which is annexed hereto.

In the course of this opinion the plaintiff will be referred to as the corporation, and the Reade brothers' partnership, Reade Manufacturing Company, will be referred to as the partnership.

In the final analysis the case is resolvable into two questions of law:

1. Did the plaintiff corporation assume liability for the Staley tort claim when it acquired the business?

2. Were the payments made by the plaintiff corporation ordinary and necessary expenses paid or incurred in carrying on the business?

As to the first matter to be discussed, reference must be had to the terms and circumstances of the taking over of the partnership by the corporation, formed for tax purposes and owned almost exclusively by the partnership made up of Charles H. Reade and Leonard J. Reade (to whom were issued stocks in the corporation in the following amounts: Charles H. Reade 149 shares, Leonard J. Reade 150 shares, the single remaining qualifying share going to one Charles F. Reade). These three persons were and are the sole stockholders, officers and directors of the corporation.

Reference to the proposal to sell the partnership business to the corporation, and the acceptance thereof by the corporation, with statements in the minutes of the corporation, indicates the true state of affairs at the time of taking over of the affairs of the partnership, and the construction to be given to the agreement. The first minutes of the corporation state that the offer of sale made to the taxpayer included "all of the assets and good will of the partnership business * * * subject, however, to the outstanding liabilities." There is then set forth a letter signed by Charles H. Reade and Leonard J. Reade which lists the assets to be transferred and the existent liabilities, the difference showing the sum of $20,000 excess of assets over liabilities. The letter also included a statement that the corporation was to take over the business as a going concern. It further stated that it was understood that the company is not to assume any of the personal liabilities of the partners as distinguished from partnership liabilities, nor any past or present partnership income tax liabilities. Thereafter by resolution the said offer as set forth in the said proposal was approved and accepted, and it was further resolved that the proposed agreement for the assignment and sale of the said business be approved, and necessary authority was

given to the officers to execute the agreement, effected by issuance of stock.

In the list of liabilities there was no inclusion of nor any reference to any claim of the Staley Company against the partnership.

It may be well at this time to advert to the Staley claim, its nature and its origin. In April, 1947 the partnership herein referred to sold two tank cars of liquid caustic soda which was ultimately purchased by A. E. Staley Manufacturing Company (herein referred to as Staley) to be used in the manufacture of soy sauces. Certain persons using the sauce became ill from arsenic poisoning and sued Staley, recovering approximately $800,000. In the same year Staley informed the partnership that Staley intended to hold the partnership liable for its losses because of the use of the partnership product in the manufacture of the soy sauces.

Before suit on this claim was started the plaintiff corporation was formed on May 1, 1948 to acquire the business of the partnership.

In November, 1948 Staley instituted suit against the partnership for over a million dollars, and in November, 1949 the corporation was joined in this suit as a defendant, it being alleged that the corporation had assumed the partnership liability for the Staley claim. This was denied by the corporation.

At no point either in the proposal or the minutes of the corporation is there to be found reference to the Staley claim as one of the partnership liabilities. At the time of the transfer of assets and liabilities, the partnership had not been sued. According to the stipulation made by the parties to this suit, the partners, on consultation with counsel, after receiving notice of the Staley claim, decided that they could successfully defend the suit and decided to "fight the case."

From the foregoing it appears that neither the proposal hereinbefore referred to, nor the acceptance, regarded the Staley claim as a liability, contingent or otherwise, to be assumed by the corporation. The proposal was explicit in the list of assets and liabilities and nothing else appears to have been in contemplation of the parties. The proposal nowhere mentions that *all* of the liabilities of the partnership are to be assumed by the corporation. Under the accepted rules of construction of contracts, the specific language of the agreement seems clear, such repugnancies as may appear to exist being solvable to accord with the expressed purpose evident in the proposal. Moreover, it would seem absurd for the corporation to have assumed a formidable contingent liability such as would have rendered it patently insolvent from the moment of such assumption.

█ It is the court's opinion that the Staley claim was not assumed by the corporation.

Comes now the second question. Further facts stipulated to by the parties hereto show that subsequent to the joining of the corporation as a party defendant in the suit initiated by Staley against the partnership, the directors of the corporation, fearful of the destructive results of publicity of the allegations of the amended Staley complaint, decided that steps must be taken straightway to settle the Staley litigation. They concluded that their credit would be disastrously affected, and that the corporation's railroad customers, vital to the continuance of its business, would be lost because of doubts about the corporation's ability to perform its contracts. Its business was seasonal and the fluctuating financial conditions attendant thereon made it necessary that the corporation have ready access to credit sources at the ebbing periods as they arrived. Lack of faith on the part of banks in the ability of the corporation to carry on to the period of flow in its business, would render it impossible for the corporation to secure the credit vital to its operations. It was therefore a prime necessity to dispose of the menace of the impending suit by settlement if at all feasible.

On April 25, 1950 the suit of Staley against the partnership and the corporation was settled by the partners (who

now for all practical intents and purposes were the sole owners of the stock of the corporation) who gave their *personal* note to Staley for $50,000, payable $5,000 per year. Thereafter the corporation, by resolutions entered in its minutes, authorized the payment to Staley of $5,000 on September 1, 1950, $5,000 on September 1, 1951, $5,000 on September 5, 1952, and $5,000 on September 2, 1953 in satisfaction of the personal note installments due Staley from the Reades. Then on July 12, 1954 a resolution was passed authorizing the payment by the corporation of a lump sum settlement of $22,000 in full settlement of unpaid balance of the Reades' note.

The corporation made the payments in installments because it did not have cash to effect the settlement and any attempt to borrow money or assume the liability would have an adverse influence on its credit with banks.

In its income tax rèturns the corporation claimed deductions for the payments made to Staley. The deductibility of the most recent $5,000 payment and the $22,000 payment was challenged by the Internal Revenue Service.

The point to be settled is whether the payments were ordinary and necessary business expenses within the ambit of the statute concerning deductions for such expenditures. 26 U.S.C. § 23(a) (1) (A) (I.R.C.1939) provides in part:

"* * * there shall be allowed as deductions * * * all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *".

The corporation urges that it had been advised by the banks that the Staley tort claim, unless settled, would cause the cutting off of credit from them. The corporation could not execute the note itself because of jeopardy to its balance sheet position, and it did not have cash on hand sufficient to pay the amount of the settlement. Hence the necessity for the execution of the $50,000 note by the Reades personally, for the protection of the cor-

poration. Of course in the event of failure of the Reades to pay the note, recourse could not be had to the corporation and the note presumably constituted an accord and satisfaction of the tort claim. However, the corporation asserts a moral obligation to pay on behalf of the Reades since it "induced" the Reades to bring about the settlement.

There are a number of cases which support the contention that a moral obligation is sufficient basis for a deduction where the payment is made to promote or protect the taxpayer's business. See Dunn & McCarthy v. Commissioner, 2 Cir,. 1943, 139 F.2d 242; First National Bank of Skowhegan v. Commissioner, 1937, 35 B.T.A. 876; Canton Cotton Mills v. United States, 1951, 94 F.Supp. 561, 119 Ct.Cl. 24; Commissioner v. Doyle, 7 Cir., 1956, 231 F.2d 635; and Catholic News Publishing Co. v. Commissioner, 1948, 10 T.C. 73, among others. In these cases payments were made to protect good will and credit already established in contradistinction to the theory of Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212, where payments were made to create good will.

The interpretation of the words of the statute "ordinary and necessary" is subject to the compulsive effect of circumstances in each individual case. In the Third Circuit in the case of Commissioner v. Gilt Edge Textile Corp., 3 Cir., 1949, 173 F.2d 801, the court refused to pass on the validity of the doctrine that "even a moral obligation, arising out of a business transaction, will support a loss deduction" since the facts did not warrant it. However, in footnote 3 the court indicates that "while discharge of a moral obligation may be laudable" it does not follow that it permits a tax deduction therefor. Further manifestation of the tendency of the Third Circuit Court of Appeals to look with a jaundiced eye on claims of payment made in pursuance of a "moral obligation" may be found in Farnsworth v. Commissioner, 3 Cir., 1959, 270 F.2d 660, where a partner compromised claims for individual and partnership state income taxes against him-

self and his partners because of moral and familial obligations as well as business reasons. The court (at page 666) indicated that such obligations do not amount to the compulsion necessary to sustain a deduction under a different though analogous provision.

There is a further matter to be considered in measuring the pressure of moral obligation in the instant case. The partners, who gave their note for the settlement moneys for the corporation and the partnership, are the sole stockholders, minus a qualifying one share of the corporation. Who benefited from the settlement? If the corporation had not paid the amount of settlement, or had not reimbursed the partners in the event that they had paid it, neither the corporation nor the individuals could have benefited from the transaction by way of tax deduction. In the present setup the partners would benefit more or less directly from the corporation's tax deduction, if allowed.

■ In view of the situation that obtained and despite the formidable array of legal justification for tax deductions arising out of payments because of moral obligation, this court is of the opinion that in the instant case, at least, the definitive element of sufficient moral compulsion is lacking. Let judgment be entered for the defendant.

Let an order be submitted.

This opinion shall serve as findings of fact and conclusions of law.

### Stipulation of Facts.

The parties hereby stipulate by their respective counsels that the following facts may be taken as true for purposes of this case:

1. This Court has jurisdiction under Title 28 U.S.C. § 1346(a).

2. In April, 1947, a partnership composed of Charles H. Reade and Leonard J. Reade, hereinafter referred to as "partnership", sold two tank cars of liquid caustic soda which, after passing through the hands of certain middlemen, was purchased by the A. E. Staley Manufacturing Company, hereinafter referred to as "Staley", to be used in the manufacture of soy sauces.

3. Certain persons who used these soy sauces became ill from arsenic poisoning and brought suit against Staley. As a result of these lawsuits, Staley was required to pay out over $800,000.

4. Sometime in 1947, Staley through its counsel, informed the partnership that Staley intended to hold the partnership liable for the damages sustained through this sale of the contaminated caustic soda.

5. The taxpayer, Reade Manufacturing Company, Inc., was organized on or about May 1, 1948, to acquire the business of the partnership.

6. On May 1, 1948, the partnership made a proposal to the taxpayer to sell to it its chemical weed killer business upon the terms and conditions set forth in a written proposal which is shown on pages 23, 24 and 25 of the minutes of the first meeting of the incorporators of the taxpayer held on May 1, 1948. This proposal was accepted by the incorporators (page 26, item 15 of the minutes of the incorporators) and by the board of directors (items 11 and 12 of the first meeting of the board of directors held on May 1, 1948).

7. In the Statement of Assets and the Liabilities forming part of the said proposal, there is not included under any of the items listed under "Liabilities" the said claim made by Staley against the partnership.

8. The said proposal and its acceptance by the Board of Directors of the corporation constituted the purchase agreement between the partnership and the corporation. The reference in the Minutes of meeting of the Board of Directors of the corporation held on May 1, 1948, (last 2 paragraphs of item 12), to the effect that a formal purchase agreement was presented to the meeting or executed is erroneous.

9. The agreement between the taxpayer and the partnership was carried out as follows:

754

(a) The taxpayer issued to Leonard J. Reade 150 shares of no par value paid stock. Likewise, 149 shares were issued to Charles H. Reade and one share was issued to Charles F. Reade. These three persons became the taxpayer's sole officers, stockholders and directors.

(b) There was transferred onto the books of the corporation the assets and the liabilities as set forth in the statement of assets and liabilities included in the written proposal of the partnership to the taxpayer. The Staley claim never appeared on the books of the corporation.

10. If this case had gone to trial, testimony would have been adduced on behalf of the plaintiff tending to prove that the corporation was formed in order to enable the partners to obtain, as permitted by the Internal Revenue Code, sorely needed relief from about $32,000 of income taxes in arrears. The partners succeeded in obtaining such relief by means of a "tentative carry back" to calendar year 1947 of the loss established by the partnership for the period from January 1, 1948 to April 30, 1948, through the change over from a partnership to a corporation on that latter date. In other words, the loss suffered by the partners for the period from January 1, 1948 to April 30, 1948 was carried back to and deducted from the profit made by the partners in the calendar year 1947, resulting in an abatement of about $25,000 in the income taxes owed for the calendar year 1947, and leaving a balance due from them of but about $6,000.

11. On or about November 19, 1948 Staley instituted a suit in the United States District Court for the District of New Jersey against the partnership for damages on its said claim, amounting to $1,050,000. The Reades, after consultation with their counsel, Julius Lichtenstein, Esq., felt that they could successfully defend the suit and they therefore decided to fight the case.

12. The business of the corporation consisted mainly of the manufacture and application of chemical liquid weed-killer to railroad rights of way. Its business was necessarily seasonal, extending from May to some time in August. Though its active money producing period was limited to those four months, yet it had to maintain its key personnel the year round, and was required to spend huge sums during the off season. For the 1949 season, the corporation's railroad business grossed $777,000, its raw materials cost $397,000 and its payroll, (exclusive of salaries of its executive officers), came to $151,000. At the end of each weed-killing season, the corporation is in good financial condition, having cash in bank and some monies receivable on railroad contracts which are paid in a very short time thereafter. As it approaches the end of the calendar year, the corporation runs out of cash and is entirely dependent upon huge borrowings from commercial banks on open lines of credit and later against unperformed railroad contracts, to finance its operations during the off-season in preparation for the following weed-killing season, to wit:—(i) repair and rehabilitation of its equipment and of its plants at Chicago, North Kansas City, Birmingham, Jersey City and Minneapolis; inspection of the railroad rights of way which were sprayed during the season just passed, and thereafter surveying the rights of way to be sprayed in the coming season; soliciting the railroads for new orders for the next season; purchasing raw materials (which came to $397,000 for the 1949 season) in preparation for the approaching season.

13. On or about November 30, 1949, Staley filed an amended complaint against the partnership based upon the same claim, and joined the taxpayer as defendant based on the allegation that the taxpayer has assumed the partnership's liability for payment of the Staley claim. The taxpayer filed an answer denying that it had ever assumed liability for the Staley claim.

14. The directors of the corporation determined that the suit against it, arising out of that amended complaint, and its consequent publicity, posed a serious

threat to the continued existence of the corporation, and felt that the suit would cause the banks to refuse to extend it any further lines of credit or loans, and that it would affect its credit with suppliers of raw materials, and word would get to its railroad customers so that there would be doubt in the minds of the railroads whether the corporation would be able to perform its contracts. The directors further felt that the obtaining of the loans and credit was vital to the continued existence of the corporation, and it was therefore determined that steps must be taken immediately to settle the Staley litigation. The corporation had been advised by the banks from which it had been accustomed to borrow, that unless the Staley case were settled at once, no further loans or credit would be extended to the corporation.

15. The corporation did not have the cash with which to settle for $50,000, nor could it borrow the money or become a party to any note because that obligation would appear on its financial statement as a liability and, in its opinion, would adversely affect its credit with the banks. If the corporation were to give its note or become a party to a note settlement of the Staley claim for $50,000 that would result in a deficit capital of minus $18,000 on the corporation's financial statement as of April 30, 1949, and a deficit capital of minus $14,000 on its financial statement as of April 30, 1950. When Chas. H. Reade visited the banks in November of each year to arrange for financing the corporation's operations for the following year, he submitted to the banks' officials for their examination, a balance sheet of the corporation for the last fiscal year ended April 30th.

16. No agreement was entered into by the corporation with Chas. H. Reade and Leonard J. Reade, or either of them, whereby the corporation agreed to pay said note, nor was any agreement entered into among them whereby the corporation agreed to reimburse the Reades, or either of them, in the event that they, or either of them, paid the whole or any part of said note.

17. The Staley suit against the partnership and the taxpayer was compromised under an agreement whereby the taxpayer's two chief stockholders, Leonard J. Reade and Charles H. Reade, gave their personal promissory note in the amount of $50,000, payable to Staley at the rate of $5,000 per year beginning on September 1, 1950.

18. As each of the payments came due on the Staley note on September 1st, of each of the years 1950, 1951, 1952 and 1953, the corporation paid the same to Staley, and it deducted each such payment, as made, in the corporation's federal income tax return for the particular fiscal year in which the payment was made, as an ordinary and necessary business expense incurred in that year.

19. Thereafter, Chas. H. Reade and Leonard J. Reade made a compromise with Staley to pay it $22,000 in one lump sum to settle in full the balance of $30,000 still due on that note. The corporation paid the said sum of $22,000 and took a deduction therefor, as an ordinary and necessary business expense, on its federal income tax return for the fiscal year ended April 30, 1955.

20. The corporation paid to the District Director of Internal Revenue at Newark, New Jersey all income taxes shown on its federal income tax returns for the fiscal years ended April 30, 1954 and April 30, 1955.

21. At all times material to this law suit Leonard J. and Chas. H. Reade maintained 99 per cent stock ownership in the taxpayer.

22. The Commissioner of Internal Revenue disallowed the deductions taken by the taxpayer for the payment of $5,000 made by it to Staley on September 2, 1953, and the $22,000 payment made on July 14, 1954. The Commissioner of Internal Revenue accordingly assessed deficiencies in the amount of $3,573.24, together with interest of $883.66, for the fiscal year ended April 30, 1954, and in the amount of $11,440, together with interest of $2,257.11, for the fiscal year ended April 30, 1955. The taxpayer paid

these sums to the District Director of Internal Revenue in Newark, New Jersey, and timely filed claims for refund on April 2, 1959. Said added assessments and interest thereon resulted from said disallowances.

23. These claims for refund were rejected and notice of disallowance was sent to the taxpayer by registered mail on January 15, 1960. This suit was timely commenced on March 16, 1960.

24. The parties stipulate that there was no formal agreement between the taxpayer and its officers and directors that the taxpayer was bound to pay the notes issued in settlement of the Staley claim.

25. No part of the amount claimed by the taxpayer has been credited, remitted, refunded or repaid to the taxpayer or to anyone on its account.

26. In the event of decision for defendant, judgment may be entered forthwith. In the event of decision for the taxpayer, the parties will recompute the amount of judgment and will submit this question to the Court only in the event of inability to agree.

27. The parties consent and stipulate that the following are in evidence:

(a) The complaint of Staley against the partnership is identical with the First Count of the Amended Complaint.

(b) The answer of the partners to said original complaint is identical with their answer to the First Count of the Amended Complaint.

(c) The amended complaint of Staley against the partnership and the corporation.

(d) The answer of the partnership and corporation to the said amended complaint.

(e) The Order of Dismissal of the Staley case, with prejudice.

(f) The settlement note of $50,000 executed and delivered by Chas. H. Reade and Leonard J. Reade to Staley, including the entries of the payments thereon received by Staley from the cor-

poration, appearing on the reverse side thereof.

(g) Minutes of the meeting of the first meeting of the incorporators of the corporation held on May 1, 1948, setting forth the proposal of Chas. H. Reade and Leonard J. Reade to sell their partnership weed-killing business to the corporation, set forth on pages 23 to 25 both inclusive thereof, and the acceptance thereof by the said incorporators.

(h) Minutes of First Meeting of the Board of Directors of the corporation held on May 1, 1948, setting forth the acceptance and approval of said proposal by said Board, the same being identified therein as items (11) and (12).

(i) Balance sheets of the corporation as of April 30, 1949 and April 30, 1950.

(j) Letter from Internal Revenue Service to the corporation dated May 8, 1958 determining the deficiency tax liability of the corporation for the taxable years ended April 30, 1954 and April 30, 1955, together with the I.R.S.'s explanatory statement thereto annexed.

(k) Checks given by the corporation to said District Director in payment of the said added assessments and interest thereon against the corporation for the fiscal years ended April 30, 1954 and April 30, 1955.

(l) Minutes of the following meetings of the Board of Directors of the corporation:

(i) Minutes of meeting held on August 28, 1950 authorizing the corporation to pay Staley the $5,000 installment on the Reades' note which became due September 1, 1950.

(ii) Minutes of meeting held on August 31, 1951 authorizing the corporation to pay Staley the $5,000 installment on the Reades' note which became due September 1, 1951.

(iii) Minutes of meeting held on September 2, 1952 authorizing the corporation to pay Staley the $5,000 installment on the Reades' note

which became due September 1, 1952.

(iv) Minutes of meeting held on August 31, 1953 authorizing the corporation to pay Staley the $5,-000 installment on the Reades' note which became due September 1, 1953.

(v) Minutes of meeting held on July 12, 1954 authorizing the corporation to pay Staley the lump sum settlement of $22,000 in full payment of the Reades' note.

(m) Corporation's Federal Income Tax Returns for fiscal years ended April 30, 1954 and 1955.