Walter E. DITMARS and Jennie J. Ditmars, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 216, Docket 27245.

United States Court of Appeals
Second Circuit.

Argued March 6, 1962.

Decided April 13, 1962.

Charles R. Van de Walle, New York City (Constance A. Lammers, New York City, of counsel), for petitioners.

Michael I. Smith, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Marselli and William A. Friedlander, Attorneys, Department of Justice, Washington, D. C.), for respondent.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

From 1932 to 1938 Walter E. Ditmars (sometimes hereafter "the taxpayer") acted as a stock broker, financial adviser, and speculator. After 1938 he served Gray Manufacturing Company (formerly Gray Telephone Pay Station Company and hereafter "Gray"), first as president and later as a consultant. The instant controversy relates to deductions for 1955 and 1956 which Ditmars asserts to relate to the profit-making and the Commissioner to the personal side of his life.

We begin the history in 1932, because in that year May M. Johnson, Ditmars' mother-in-law, became sole trustee of a substantial testamentary trust established some years earlier under her husband's will. In 1953 one of the remaindermen under the trust—a brother of Mrs. Ditmars—seems to have concluded that a large measure of Ditmars' financial success since 1932 had been due to having gained practical control over trust assets and having used them for personal advantage. This remainderman petitioned the Surrogate's Court for Bronx County to compel his mother to furnish an account of the trust's activities, something she had not done since she became sole trustee. In July, 1953, she rendered an accounting; in January, 1954, the Surrogate's Court revoked her letters of trusteeship and permitted her to resign.

Six months later the substituted trustee, the Bronx County Trust Company, filed a petition in the Surrogate's Court seeking discovery, as authorized by New York Surrogate's Court Act, § 205. Specifically, the trustee asked that inquiry be made as to Ditmars' part in certain transactions, hereafter summarized, and

that Ditmars be directed "to deliver over to your petitioner any trust property or assets whch he may have, or to impress upon any property or assets of his, or any other person holding through him, which was acquired by the improper use of the property and assets of this trust, a trust for the benefit of this estate." The items as to which inquiry was demanded included the following:

(1) Approximately $200,000 which had been paid to Mrs. Johnson "as life beneficiary in excess of income from the trust * * *" The trustee elsewhere alleged that Mrs. Johnson had paid this money to herself "with the knowledge and assistance of" Ditmars.

(2) The sale of securities that had been in the trust's portfolio when Mrs. Johnson became sole trustee, and the loss to the trust estate caused thereby. Ditmars, said the trustee, had "contrary to the provisions of the will of the decedent, * * * converted the property and assets of the trust from sound investment securities held for the purposes of income to securities of a wholly speculative and risky character, all to the detriment of the trust, causing losses in excess of $1,000,000."

(3) The use of the trust assets to maintain the speculative trading account just referred to, and the commissions, taxes, and other charges incurred in such trading. The trustee asserted Ditmars had traded "in excess of $30,000,000 of securities" in the period from 1932 to 1939, repeatedly turning over a trust principal which on February 18, 1932 had amounted to $1,327,898.72. Commissions of "approximately" $200,000 had been paid on these transactions; "stamp taxes, bank charges and other fees" amounting to over $50,000 had also been paid.

(4) The number of shares of stock held by Ditmars in Gray and in Colt's Manufacturing Company and the consideration paid thereon. Ditmars, according to the trustee, had used trust assets "in a wholly speculative manner to secure personal control of Gray Manufacturing Company * * * and has

derived and is deriving great personal financial advantage and income, and has been unjustly enriched, all to the detriment of the trust estate."

(5) The fees received by Ditmars from managing the estate property. It was later determined that Ditmars had, between 1932 and 1938, been paid $15,800 for acting as investment adviser to the trust.

(6) The benefits received by Ditmars and his wife, alleged to amount to over $100,000, from use of trust assets for payment of personal obligations, namely mortgage interest and tax payments on a property and residence in the Bronx. Moreover, Mrs. Johnson, who previously owned the premises, was said to have borrowed $90,000 secured by a mortgage thereon, and then to have conveyed the property to Ditmars for consideration unknown. Ditmars then sold the house to a Marquesa Cuevas, and the trustee demanded inquiry as to any possible benefits received by him from such transfer.

(7) The principal losses sustained by the estate as a result of investment in securities of corporations in which Ditmars "was personally interested."

(8) All transactions by Ditmars involving trust property during the period covered by the accounting.

Ditmars objected to the jurisdiction of the Surrogate's Court. The objection was overruled, the order affirmed, 285 App.Div. 1138, 141 N.Y.S.2d 86 (1st Dept.1955), and leave to appeal denied, 286 App.Div. 801, 143 N.Y.S.2d 616 (1st Dept.1955). He thereafter testified before the Surrogate for several weeks. Later in 1955, he was advised to settle both by his own counsel and by counsel for Gray, and agreed in open court to pay $50,000 in settlement. In that year he paid fees of $16,279.17 to his attorneys for representing him in the proceeding before the Surrogate. On May 23, 1956, a consent order was entered directing Ditmars to pay $50,000 to the substituted trustee in settlement of all claims against him, and this was done.

The Commissioner having given notices of deficiencies against the Ditmars in relation to some matters not now before us, they filed amended returns claiming these two payments as deductions and seeking refunds; these the Commissioner disallowed. On a petition for review, the Tax Court, Arundell, J., in an unreported opinion, decided all claims adversely to Mr. and Mrs. Ditmars. They now petition for review of that part of the Tax Court's decision relating to the two payments. We have concluded that, under §§ 162 and 212 of the 1954 Code, 26 U.S.C.A. §§ 162, 212, petitioners were entitled to a deduction for part but not all of the attorneys' fees and the settlement, and remand to the Tax Court for determination of the appropriate amounts.

In considering whether the expenditures are properly deductible, it will be useful to divide the allegations of the substituted trustee into three groups: (1) Those relating to Ditmars' stock brokerage, stock-purchase syndicate, and financial advising activities from 1932 to 1938; (2) those relating to Ditmars' accession to the presidency of Gray and his financial gains therefrom; and (3) those dealing with May M. Johnson's alleged invasions of principal and self-dealing as facilitated by Ditmars, and with Ditmars' alleged use of trust assets to satisfy personal obligations.

(1) Ditmars' livelihood from 1932 to 1938 was derived from miscellaneous adventures in the investment field. His regular activity was that of manager of a branch of a stock brokerage firm, Taylor & Robinson, from 1932 to 1936, and of other firms from 1936 to 1938, as successive mergers took place. In this capacity, he was entitled to 50% of the net profits of the branch, and his monthly take ranged from $250 to $5000. A good share of this was from profits attributable to the large volume of trading carried on by the Johnson Trust, which was by far the largest customer of the office. The substituted trustee asserted two claims specifically relating to this trading: (a) That Ditmars had

caused the trust to lose over $1,000,000 by "churning" the trust's portfolio, and (b) that the commissions and charges paid on this trading amounting to about $250,000, were improper. Ditmars also participated in a stock-purchase syndicate during this period; the substituted trustee alleged that, in trying to produce income from this activity, Ditmars wrongfully caused the trust to buy securities in which he was personally interested. Losses in principal were alleged in relation to this; presumably these were already included in the losses claimed to have been caused by the "churning," since Ditmars the broker appears to have handled all the purchases and sales advised by Ditmars the counsellor. Finally, the trustee asserted that payment to Ditmars of $15,800, for acting as financial adviser to the trust during the 1932–1938 period, was improper.

■ There would seem to be no doubt that Ditmars' activity as branch manager of a brokerage office constituted the "carrying on" of a "trade or business" within § 162. See Schmidlapp v. C. I. R., 96 F.2d 680, 118 A.L.R. 297 (2 Cir. 1938); Hochschild v. C. I. R., 161 F. 2d 817 (2 Cir. 1947); Folker v. Johnson, 230 F.2d 906, 909 (2 Cir. 1956); Trent v. C. I. R., 291 F.2d 669 (2 Cir. 1961), and cases from other circuits cited, 291 F.2d at 673–674. Generally, the expense of resisting a claim arising from a taxpayer's trade or business is "ordinary and necessary" and therefore deductible under § 162, Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505 (1928); C. I. R. v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L. Ed. 171 (1943); Helvering v. Hampton, 79 F.2d 358 (9 Cir. 1935). Deductibility is not limited to instances where the defense was successful; the highest authority has sanctioned the deduction of legal "expenses resulting from the defense of a damage suit based on malpractice, or fraud, or breach of fiduciary duty * * * without regard to the success of the defense," C. I. R. v. Heininger, 320 U.S. at 472, 64 S.Ct. at 253, 88 L.Ed. 171. Amounts paid in satisfaction of a judgment on such a claim are likewise deductible, Helvering v. Hampton, supra; hence amounts paid in settlement, in the exercise of a good faith business judgment, must likewise be, Levitt & Sons v. Nunan, 142 F.2d 795 (2 Cir. 1944); Jerry Rossman Corp. v. C. I. R., 175 F.2d 711 (2 Cir. 1949); C. Ludwig Baumann & Co. v. Marcelle, 203 F.2d 459 (2 Cir. 1953); C. I. R. v. Macy, 215 F.2d 875 (2 Cir. 1954).

The claims relating to losses suffered through churning the Johnson trust for the alleged purpose of increasing brokerage commissions, and for excessive commissions and other charges likewise so caused, seem entirely analogous to those referred to by the Supreme Court in Heininger. "Business-getting" is a normal function of the manager of a brokerage office, and "business" can be "gotten" either by adding clients or by adding activity from clients already in hand. To be sure, it is not normal to procure added activity by advice not honestly given in the client's interest—at least we hope not—but neither is it normal for realtors to procure leases by fraud, Helvering v. Hampton, supra, for surgeons to leave scissors in abdomens, or for "dentists in the mail order business * * * to sell false teeth by fraudulent representations as to their quality * * *," C. I. R. v. Heininger, 320 U.S. at 471–472, 64 S.Ct. at 253, 88 L. Ed. 171. What is ordinary is that the conduct of almost any trade or business will give rise to claims, many invalid but some valid; resisting such claims, paying judgments rendered on some, and settling others, is thus an "ordinary and necessary" expense of "carrying on any trade or business" within § 162.

■ If a deduction for amounts paid in defending and settling such claims would be warranted had Ditmars still been running a branch office in 1955 and 1956, as we think it would be, no different result is here demanded because the payments came after taxpayer had withdrawn from the trade or business giving rise to them. Literally, to be sure, the statute speaks of "ordinary

and necessary expenses paid or incurred during the taxable year in"—not as a result of—"carrying on any trade or business," and some of the remarks in Heininger, 320 U.S. at 472, 64 S.Ct. 249, 88 L.Ed. 171, about defending an existing business are inapplicable when there is no longer a business to defend. Yet we cannot believe either Congress or the Supreme Court meant that a doctor or lawyer may not deduct amounts paid to defend a malpractice suit brought after his retirement although he could before, and no different rule is applicable to a broker.

■ The other claims in this first group relate to activities of Ditmars, as a participant in stock syndicates and as an adviser to the trust, which did not constitute "carrying on any trade or business," Higgins v. C. I. R., 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941); see McDowell v. Ribicoff, 292 F.2d 174 (3 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 135 (1961). However, these activities were conducted "for the production or collection of income" within § 212, which was originally enacted, in 1942, as § 23(a) (2) of the 1939 Code, "to provide for a class of non-business deductions coextensive with the business deductions allowed by § 23(a) (1), except for the fact that, since they were not incurred in connection with a business, the section made it necessary that they be incurred for the production of income or in the management or conservation of property held for the production of income," Trust of Bingham v. C. I. R., 325 U.S. 365, 374, 65 S.Ct. 1232, 1237, 89 L.Ed. 1670 (1945).

■ The Bingham decision itself indicated that the tests of "ordinary and necessary" to be applied under what is now § 212 were to be the same, *mutatis mutandis*, as under what is now § 162. Specifically the Court approved the deduction of "litigation expenses when they are directly connected with or proximately result from" the activity described in the section, 325 U.S. at 376, 65 S.Ct. at 1238, 89 L.Ed. 1670, citing the Korn-

hauser and Heininger decisions, supra. We can see no reason in principle therefore, why amounts spent by Ditmars in defending against, or in settling, the trustee's claim for return of the $15,-800 received by him as an investment adviser, should stand on any different basis under § 212 than amounts spent by a lawyer in resisting or settling a claim for the refund of a fee alleged to have been unlawfully collected would occupy under § 162. Neither can we see why amounts expended by a participant in a single stock syndicate in resisting or settling a claim by a purchaser should be regarded less favorably under § 212, than amounts spent in defending or settling such a claim by an investment banking firm that regularly participates in marketing securities would be viewed under § 162. To such extent as C. I. R. v. Heide, 165 F.2d 699 (2 Cir. 1948), suggests a more severe test under § 212, we believe that any basis for this view has been undermined by C. I. R. v. Macy, supra, as leading tax authorities have intimated, Surrey and Warren, Federal Income Taxation, Cases and Materials (1960 ed.), p. 269.

(2) The deductibility of amounts paid in defending or settling the claims relating to the purchase of Gray stock raises a more difficult question. The pertinent facts are as follows:

In the middle of 1938 the Johnson Trust began buying shares in Gray, the original manufacturer of the pay telephone. By November, 1938, the trust owned nearly a sixth of the voting stock of Gray, and Ditmars had gotten himself elected to the board of directors although he personally owned only a token amount of stock. The stock was paying no dividends, and paid none until 1945. Gray needed a new president—H. Otto Vogt had taken on the job in February, 1938, with the understanding that he would remain only temporarily until a capable full time executive could be found. On November 17, 1938, pursuant to Vogt's suggestion, the board elected Ditmars as president. In a letter to stockholders dated November 19, 1938, Vogt explained

that Ditmars, besides having the required ability, capacity, and experience for the job, represented "the largest stockholding interest in the company." His salary ranged from a low of $15,000 to a high of $50,000 a year. In addition, he received an option to purchase 25,000 shares which was exercised with resulting gains, and another option in like amount which had not yet been exercised (save for 10 shares) at the time of the hearing.

The substituted trustee alleged that Ditmars had speculatively used the assets of the Johnson Trust to secure personal control of Gray, and apparently would have sought turnover of profits which Ditmars made as a consequence. A short article in a New York newspaper, on June 23, 1955, reported that "Walter E. Ditmars, president Gray Manufacturing of Hartford, is testifying before Bronx Surrogate Christopher McGrath in a case charging him with mishandling the million dollar Arthur G. Johnson estate." As previously indicated, counsel for the company advised that the publicity "is being done deliberately to harm you. It is going to harm the company, settle by all means." Apparently by the time the settlement was consummated, a proxy fight was brewing in Gray, with the opposition planning to make reference to the charges brought by the substituted trustee. Later in 1956 Ditmars resigned as president but remained as a salaried "special consultant"—the record does not reveal whether the opposing group came into control.

■■ The decisions first above cited make it clear that serving as president of Gray constituted "carrying on any trade or business" within § 162. The Hochschild case is square authority in this Circuit that amounts expended in defending a suit claiming breach of duty as a corporate officer are deductible under what is now that section. However, not every expenditure made by a person engaged in a trade or business to terminate litigation whose continuance is reasonably regarded as harmful to his success in it is an "ordinary and necessary" expense "in carrying" it on. To such extent as litigation springs solely from the taxpayer's non-business life, expenses of defending or settling it are "personal" expenses whose deduction is forbidden by § 262, even though the litigation might be detrimental to the taxpayer's profit-seeking activities; such is the teaching of Bonney v. C. I. R., 247 F. 2d 237, 239–240 (2 Cir.), cert. denied, 355 U.S. 906, 78 S.Ct. 333, 2 L.Ed.2d 261 (1957), and Lewis v. C. I. R., 253 F.2d 821, 825 (2 Cir. 1958).

■ However, the claim relating to the Gray stock differs from those asserted in Bonney and Lewis in that it sprang from Ditmars' profit-seeking activities. The Trustee's complaint was that Ditmars had caused the trust to purchase Gray shares for the precise purpose of obtaining business advantages for himself, and Vogt's letter is evidence that the purchase had a causal relation to Ditmars' entering into the trade or business of being a well-paid officer of Gray. It would thus be hard to say that placing the trust in the Gray shares and the expense of defending a claim for having done so related to the portion of Ditmars' personality concerned with "satisfying his needs as a human and those of his family," Surrey and Warren, supra, at p. 272, as to which § 262 prohibits deduction; and this Court's disapproval, in Lewis v. C. I. R., 2 Cir., 253 F.2d at 826–827, of Baer v. C. I. R., 196 F.2d 646 (8 Cir. 1952) and, inferentially, of such of its progeny as McMurtry v. United States, 132 Ct.Cl. 418, 132 F.Supp. 114 (1955) and Bowers v. C. I. R., 243 F.2d 904 (6 Cir. 1957), all involving problems arising from marital discord, is to be distinguished on that ground, whatever the ultimate decision of the issue presented in such cases may be, see Davis v. United States, 287 F.2d 168 (Ct.Cl.1961), cert. granted, 368 U.S. 813, 82 S.Ct. 48, 7 L.Ed.2d 21 (1961); Patrick v. United States, 288 F.2d 292 (4 Cir. 1961), cert. granted, 368 U.S. 817, 82 S.Ct. 57, 7 L.Ed.2d 22 (1961); Gilmore v. United States, 290 F.2d 942 (Ct.Cl.), cert. granted, 368 U.S. 816, 82 S.Ct. 57,

7 L.Ed.2d 22 (1961). The problem rather is whether the situation wherein an individual obtains corporate office by causing persons friendly to him to purchase significant amounts of stock is so abnormal that the defense and settlement of a claim for malfeasance in procuring this is not "ordinary and necessary" within the rule of Deputy v. DuPont, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416 (1940).

The situation giving rise to the trustee's claim as to the Gray stock does not appear to us anything like so extraordinary as that in Deputy v. DuPont, and the Tax Court did not place its decision on any such ground. Office in corporations, both big and small, is often achieved by control of the votes of shares, owned sometimes by the officer and sometimes by persons who have purchased or continued to hold them on his recommendation. There is always a fair chance that persons thus induced to acquire or hold the shares will seek redress from the officer if their hopes of profit are not fulfilled. Hence we do not regard the transaction giving rise to this aspect of the trustee's suit as so abnormal as to prevent the portion of the settlement and legal expenses attributable thereto from being deductible under § 162. See Dunn & McCarthy, Inc. v. C. I. R., 139 F.2d 242 (2 Cir. 1943).

■ (3) What has already been said pre-figures our holding that, in contrast, amounts paid in defending or settling the third group of claims asserted by the substituted trustee are nondeductible. Ditmars' alleged aid to his mother-in-law in the siphoning of principal and in self-dealing related neither to any trade or business of his nor to any activities carried on for the production of income. His use of trust moneys to pay personal mortgage and tax obligations on a residence in the Bronx was similarly unconnected with the kind of efforts demanded by §§ 162 and 212, as was any improper profit he derived from sale of the residence. A claim that he had to assist in his mother-in-law's allegedly wrongful acts in order to assure her complaisance in other acts that he desired her to take for his own profit goes too far; if a word to rule it out is needed, "proximate" will serve. Any argument for deductibility under § 212 on the basis that amounts for which Ditmars might be held liable on such claims would deplete income producing assets is foreclosed by Lykes v. United States, 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791 (1952). Neither can amounts paid in relation to these claims be deducted on the basis that Ditmars was attempting to forestall derogatory publicity so as to preserve his position as president of Gray. For these were claims directed at "the totality that is the individual" rather than at his "occupational activities as such," Lewis v. C. I. R., 2 Cir., 253 F.2d at 825, 826, and therefore "the effect upon * * * [his] trade or business, harmful though it may be, is merely incidental to the harm which he otherwise suffers," id. at 826. Finally, taxpayer's reliance on § 1341, 28 U.S.C.A. is wholly misplaced with respect to this third group of claims. Whatever bearing that section might or might not have as to items that entered into Ditmars' gross income, those with which we are here concerned never did.

■ The counsel fees and settlement payment were thus deductible to the extent that they related to some of the claims asserted by the successor trustee but not to others. The taxpayers having shown that the Commissioner's disallowance of the entire refund claim was erroneous, they are entitled, as the Government properly conceded at the argument, to have the Tax Court make an allocation of the deductible portion of the expenditures. Helvering v. Taylor, 293 U.S. 507, 515–516, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Federal National Bank of Shawnee, Okl., v. C. I. R., 180 F.2d 494, 497 (10 Cir. 1950); cf. Cohan v. C. I. R., 39 F.2d 540 (2 Cir. 1930). In making this allocation the Tax Court is free to take such testimony as it needs. We recognize that a rough approximation is all that can be expected. The records of Ditmars' attorneys may contain material that will assist in the allocation of the

counsel fees, and opinion evidence may have to be taken as to the relative gravity of the trustee's charges—unless, indeed, the parties should avail themselves of a less scientific but probably more satisfactory method of disposition.

Reversed and remanded for further proceedings in accordance with this opinion.