R. WALTER GRAHAM, JR., AND DOROTHY H. GRAHAM, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91430. Filed April 10, 1963

*William G. Halby*, for the petitioners.
*Donald W. Howser*, for the respondent.

OPINION

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1957 in the amount of $8,789.11.

The petition assigns one error as follows:

(a) Respondent erroneously disallowed a deduction in the amount of $9,453.00 which he characterized as the "cost of a proxy fight."

The facts were all stipulated and are so found.

Petitioners are husband and wife, residing in Baltimore, Md. They timely filed a joint Federal income tax return for the calendar year 1957 with the district director of internal revenue in Baltimore, Md., on the cash receipts and disbursements basis. Dorothy H. Graham is a petitioner only by reason of having filed a joint return with her husband, and the term "petitioner" hereinafter will refer to the husband.

During the taxable year 1955 and subsequent taxable years petitioner was comptroller of the city of Baltimore, a political elective office, for which he received compensation of $10,000 per annum. Petitioner was a member of the board of directors of Value Line Advisory Service prior to 1954. In June 1953 petitioner became the medical director of Maryland Hospital Services, Inc. (Blue Cross), and of Maryland Medical Services, Inc. (Blue Shield), from which offices he resigned in 1955. For serving as medical director, petitioner received compensation of $5,000 per annum. Petitioner was a practicing physician in the city of Baltimore for several years prior to 1955.

Since May 26, 1954, petitioner has been a director of the New York Central Railroad Co. (herein called Central) and has regularly attended meetings of the board of directors. For each of the years 1955 to 1961, inclusive, petitioner received $2,400 from Central as director fees. Between March 1947 and March 1954, inclusive, in 10 transactions petitioner purchased 44,000 shares of common stock of Central and in 2 transactions sold 4,000 shares. Between March 1956 and May 1962, inclusive, in nine transactions petitioner purchased an additional 34,000 shares and in a single transaction sold 8,000 shares of Central common stock, leaving a net of 66,000 shares held as of May 1962.

At all times material to this case Central was one of the largest railroad systems in the United States, with assets of about $2,600 million. It had outstanding one class of stock, consisting of 6,447,410 shares, which was held by approximately 41,000 stockholders, some of whom were outside the United States. Central stock was actively traded on the New York Stock Exchange as well as other exchanges. The following table shows the consolidated earnings of Central and its subsidiaries, the dividends paid by Central, and the price range of Central stock on the New York Stock Exchange for the years 1949 to 1958, inclusive:

| Year | Consolidated earnings (per share) | Dividends paid (per share) | Price range | |
|------|-----------|-----------|------|-----|
| | | | High | Low |
| 1949 | $2.09 | (1) | 13½ | 9¼ |
| 1950 | 3.04 | $1.00 | 21⅞ | 11½ |
| 1951 | 3.26 | .50 | 26¼ | 15½ |
| 1952 | 4.95 | .50 | 23½ | 17 |
| 1953 | 6.94 | 1.00 | 25½ | 18¾ |
| 1954 | 2.12 | (1) | 34⅝ | 18⅝ |
| 1955 | 8.78 | 2.00 | 49½ | 31¾ |
| 1956 | 6.58 | 2.70 | 47¼ | 32¼ |
| 1957 | 1.88 | 2.73 | 36⅝ | 13½ |
| 1958 | 1.07 | (1) | 29¾ | 13¼ |

¹ None.

At all times material to this case, Alleghany Corp. (herein called Alleghany) was an investment company incorporated under the laws of the State of Maryland. Robert R. Young was chairman of the board and Allan P. Kirby was president of Alleghany.

During 1954 Alleghany and 15 individuals, including Young, Kirby, and petitioner, styling themselves the proposed Alleghany-Young-Kirby Ownership Board, solicited proxies from the stockholders of Central in an effort to unseat the incumbent management at the annual meeting of Central stockholders which was to be held on May 26, 1954. It was agreed by Alleghany and such individuals that the cost of the proxy solicitation would be borne by Alleghany and such 15 individuals on the basis of their average holdings of Central stock during the

year beginning May 26, 1954. It was further agreed that Alleghany would advance the interim costs of the solicitation, for which it would be proportionately reimbursed by the individuals. Whether Alleghany and the individuals would seek any reimbursement from Central of all or any part of their solicitation expenses was to be determined in the light of the results of litigation then pending in a New York court by Young and Kirby against the incumbent Central directors to prevent the latter from expending Central's funds in the proxy battle. In addition to this suit there were three other suits pending in the State courts and before the Interstate Commerce Commission.

The management of Central also solicited proxies from the stockholders. Both sides employed professional proxy solicitors. Proxies were also solicited by newspaper, television, and radio advertising, and by mail.

In connection with the proxy contest, including the matters described in the preceding paragraph, Alleghany advanced the sum of $1,308,733.71, consisting of the following categories of expenditures:

| | |
|---|---|
| Advertising | $319,469.07 |
| Legal fees and expenses | 401,045.08 |
| Stationery, supplies, cost of mailing proxies | 198,669.88 |
| Clerical help, proxy solicitors, consultant's fees, etc | 258,872.76 |
| Rental of equipment, etc | 60,212.02 |
| Telephone, telegraph, travel, living expenses of personnel from out of town, accounting fees, etc | 70,464.90 |
| Total | 1,308,733.71 |

In a letter to the shareholders dated April 8, 1954, the Alleghany-Young-Kirby faction alleged that the earnings of Central had decreased below that of other railroads as a group and that, of the 19 largest railroads in the eastern district, the Pocahontas and southern regions, Central ranked, with one exception, the poorest in 1952 in operating ratio (expenses to revenues) for freight service. The letter alleged that the sorry state of Central affairs was basically due to the fact that its board owned only 13,750 shares of Central stock, or less than one-fourth of 1 percent, and was dominated by banking interests. The Alleghany-Young-Kirby group proposed to install new and economical passenger equipment to help eliminate Central's operating loss in the passenger department, to sell Central's New York City real estate in order to produce funds with which to buy Central bonds quoted at discount and improve its financial condition, and to modify the employment contracts of certain key officers of Central. It was alleged that only by an alert, vigorous top direction by owners determined to bring competition into every phase of the company's affairs can the career of excessive transportation ratio left Central by its banker-dominated board be cut out.

The letter to shareholders also alleged that the incumbent board had said it intended to wage an all-out campaign in the press, radio, television, and magazines, that the incumbent board had hired a high-powered publicity firm and professional proxy solicitors, and that the Alleghany-Young-Kirby group had commenced suit against the present board to stop these expenditures of Central's funds. In their proxy statement which accompanied such letter to shareholders, the Alleghany-Young-Kirby group stated that its solicitation would be made by mail, telephone, telegraph, and personal solicitation, and that no professional solicitors had been engaged, nor was it anticipated that they would be.

During the proxy contest, Alleghany owned approximately 11,000 shares of Central stock. As of March 1, 1955, Alleghany had increased its holdings of Central stock so that it owned beneficially 387,000 shares of Central stock and in addition owned a one-half interest in each of two joint ventures (with the Murchison Brothers and Sid W. Richardson, respectively) which held 300,000 Central shares apiece (or an aggregate of 600,000 shares).

On or about April 8, 1954, the nominees on the proposed Alleghany-Young-Kirby board owned 1,089,880 shares of Central stock; 1,000,200 of such shares were owned by Young, Kirby, Murchison, and Richardson. In addition to the 40,000 shares then owned by petitioner, 1,800 shares were owned by other members of his family.

At the annual meeting of Central shareholders held in Albany, N.Y., on May 26, 1954, the slate of the candidates of the Alleghany-Young-Kirby ownership board, including petitioner, was elected.

At a meeting of the new board of directors of Central, of which petitioner was now a member, held on March 1, 1955, Young as chairman of the board informed the board that a proposed form of proxy statement had been prepared with respect to the annual meeting of stockholders which was to be held on May 26, 1955, and that one of the resolutions proposed to be submitted to the stockholders at such meeting was an "Authorization for the reimbursement by the Company of expenses incurred by Alleghany Corporation and the present Board of Directors (with the exception of Mr. Perlman) in connection with the 1954 proxy contest."

Prefixed to the proxy statement was a letter from Young to the shareholders of Central which said, in part:

It is not our desire to impose undue burden upon the owners of the New York Central. However, the many pages which follow, embodying Proxy Statement and appended Exhibits, deserve your attention, for it is upon this material that we ask you to base your decision in voting on several resolutions affecting the future progress of your Company:

*     *     *     *     *     *     *

Resolution No. V * * * [which is as follows:]

RESOLVED, that Stockholders assembled in person and by proxy in Annual

Meeting do hereby approve the reimbursement by the Company of expenses incurred by Alleghany Corporation and the present Board of Directors (with the exception of Mr. Alfred E. Perlman) in connection with the 1954 proxy contest in an amount not to exceed $1,308,733.71.

At the annual meeting of Central stockholders held in Albany, N.Y., on May 26, 1955, the stockholders, by a vote of 4,899,495 shares *for* and 457,129 shares *against*, approved Resolution No. V set forth in the previous paragraph.

Central's board of directors, including petitioner, reelected at said stockholders' meeting, met on the same day and adopted the following resolution:

RESOLVED: That the Treasurer or any Assistant Treasurer be and each is hereby authorized and directed to deliver the amount of $1,308,733.71 to Alleghany Corporation.

Central paid Alleghany $1,308,733.71 in 1955 pursuant to such resolution.

Certain stockholders of Central who were opposed to the adoption of Resolution No. V commenced derivative stockholders' suits on behalf of Central and its stockholders against Alleghany, the persons constituting the board of directors of Central, including petitioner, and against Andrew Van Pelt (who resigned as a director of Central on or about September 14, 1954). The first derivative action was commenced in the New York Supreme Court of New York County on May 3, 1955, by one Elick Lowitz, which was followed by a similar suit commenced on May 18, 1955, by one Joseph Schildkret. Both such actions were duly commenced on such dates by service of process. The Schildkret and Lowitz actions were consolidated on June 14, 1955. Such consolidated amended complaint restates, in substance, the causes of action and prayers for relief contained in the individual complaints previously filed by such persons. Subsequently, a derivative action was begun by one Hyman Krinsky, which action was consolidated with the then consolidated Schildkret-Lowitz action on September 7, 1955. Two more derivative actions were commenced by stockholders of Central against the same defendants.

The various stockholder derivative suits above referred to were settled in 1956 and 1957 on terms providing, among other things, for the payment to Central by the defendants of the sum of $300,000.

Alleghany and the individual defendants, including petitioner, made the $300,000 settlement payment to Central in proportion to their average holdings of stock of Central during the year beginning May 26, 1954. Petitioner paid $9,453 of such settlement to Central in 1957. The body of petitioner's letter of transmittal of such payment is as follows:

Enclosed, find my check for $9,453.00 made payable to the New York Central Railroad Company which represents my share of the 1954 proxy fight cost.

In their income tax return for the year 1957, petitioners claimed a deduction for the said payment of $9,453 as "Cost of Proxy Fight N.Y. Cent. R.R." In the statutory notice respondent disallowed the deduction with the following explanation:

The deduction claimed on your return for the cost of a proxy fight in the amount of $9,453.00 is disallowed for the reason that you have failed to establish that the amount is an allowable deduction under any provision of the Internal Revenue Code of 1954.

In the income tax return filed by petitioner for the year 1954 no deduction was claimed for expenditures made in connection with the aforementioned proxy contest. In the income tax return filed by petitioner for the year 1955 no amount was included in income on account of the payment of $1,308,733.71 by Central to Alleghany.

Petitioner contends that he is entitled to deduct the expenditure of $9,453 either as an ordinary and necessary business expense under section 162, I.R.C. 1954; [1] or as a loss under section 165, I.R.C. 1954; [2] or as a nonbusiness expense under section 212 of the same Code.[3]

We do not think the expenditure is deductible as an ordinary and necessary business expense under section 162. In order to be deductible under this section, we would have to find at the outset that petitioner was engaged in a trade or business. Of course, petitioner contends that he was so engaged; that being a director of Central on an annual salary of $2,400 and attending all of the board meetings was sufficient to give him such a status. However, the stipulated facts do not show the number of meetings held during a year or the amount of time petitioner devoted to his directorship. He was comptroller of the city of Baltimore, Md., a political elective office, for which he received compensation of $10,000 per annum. Prior to 1955 he had been a practicing physician in Baltimore, and a medical director of Blue Cross and Blue Shield. Prior to 1954 he had been a member of the board of directors of Value Line Advisory Service and in May 1962 he became a member of the board of directors of

---

[1] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

[2] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

* * * * * * *

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *

[3] SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; * * *

Alleghany. But in the taxable year 1957 his only activities which might be regarded as being engaged in a trade or business were his directorship in Central and his position of comptroller. The expenditure of $9,453 had no relationship to his position of comptroller and we are unable to find that his activities as a director in Central were sufficient to constitute being engaged in a trade or business.

In each of the cases cited by petitioner it was found that the particular taxpayer's activities were of sufficient scope to constitute a trade or business. In *William Ziegler, Jr.* (sub nom. *Great Island Holding Corporation*), 5 T.C. 150, 162, we found that the taxpayer was the president and director of a corporation to which he devoted a considerable part of his time. In *William L. Butler*, 17 T.C. 675, 679, the parties agreed that the taxpayer's business was that of acting as a consultant, officer, or director of public utility corporations. In *Hochschild* v. *Commissioner*, 161 F. 2d 817 (C.A. 2, 1947), reversing 7 T.C. 81, the taxpayer was a principal executive officer of the corporation and it was not questioned but that he was carrying on a trade or business. Similarly, in *Ditmars* v. *Commissioner*, 302 F. 2d 481 (C.A. 2, 1962), reversing and remanding a Memorandum Opinion of this Court, the taxpayer was the chief executive officer of the corporation, Gray Manufacturing Co. Also, in *Falker* v. *Johnson*, 230 F. 2d 906 (C.A. 2, 1956), the taxpayer devoted full time to his employment as president, treasurer, and director of the corporation there involved.

On the basis of the stipulated facts, we hold that petitioner was not entitled to the deduction claimed under section 162.

Neither do we think petitioner is entitled to the deduction under section 165. Having held that as a director in Central petitioner was not engaged in a "trade or business," no deduction for losses would be allowable under section 165(c)(1).[4]

In determining whether the expenditure of $9,453 comes within section 165(c)(2),[4] it becomes necessary to look at the origin and nature of the expenditure itself. Cf. *Arrowsmith* v. *Commissioner*, 344 U.S. 6; *United States* v. *Gilmore*, 372 U.S. 39 (1963); and *United States* v. *Patrick*, 372 U.S. 53 (1963). The origin of the transaction was petitioner's entrance into the proxy fight on or about April 8, 1954, when he and 14 other individuals and Alleghany solicited proxies from the stockholders of Central in an effort to unseat the incumbent management at the annual meeting of Central stockholders which was to be held on May 26, 1954. At that time it was agreed by Alleghany and the 15 individuals, including petitioner, that the cost of the proxy solicitation would be borne by Alleghany and the 15 individuals on the basis of their average holdings of Central stock during the year beginning May 26, 1954. It was further agreed that Alleghany would

---

[4] See footnote 2, *supra*.

advance the interim costs of the solicitation for which it would be proportionately reimbursed by the individuals. Alleghany advanced a total of $1,308,733.71. Petitioner's proportionate share of this cost was approximately $41,300. This was definitely a liability owing by petitioner. Then came the reimbursement from Central to Alleghany for the entire amount of the cost of the proxy solicitations which in turn brought on the several derivative stockholders' suits on behalf of Central and its stockholders against Alleghany and the 15 individuals, including petitioner, asking that the $1,308,733.71 which Central had paid Alleghany be returned to Central. These derivative suits were compromised for $300,000. Petitioner's share of the compromise was the $9,453 here in question which petitioner paid to Central on April 8, 1957, as representing "my share of the 1954 proxy fight cost." Looking at the entire transaction from its origin, it does not appear that petitioner has sustained any "loss" as such. On the contrary, he has been relieved from the greater part of his liability of $41,300 which originally was his share of the 1954 proxy fight cost. In other words, he was relieved of a liability of $41,300 by the payment of only $9,453. This payment of $9,453, in our opinion, was not a loss.

In *Kornhauser* v. *United States*, 276 U.S. 145, the Court held that a taxpayer might deduct as an ordinary and necessary business expense the litigation expenses incurred by him in successfully defending a suit for an accounting by a former partner. The taxpayer had also contended that the litigation expenditures were deductible as a loss incurred in a trade or business under section 214(a)(4) of the Revenue Act of 1918. In denying this contention, the Supreme Court succinctly said: "We think it is obvious that the expenditure is not a loss * * *."

This brief holding of the Supreme Court has been cited and relied upon in numerous cases, a few of which are in the margin.[5] In *Hales-Mullaly* v. *Commissioner*, 131 F. 2d 509, 512 (C.A. 10, 1942), affirming 46 B.T.A. 25, the Tenth Circuit, among other things, said:

It suffices to say without elaboration that expenditures made in the compromise of litigation and for attorneys fees and other expenses in connection with the litigation do not come within the ambit of that section. [Sec. 23(f), Revenue Act of 1936.] *Kornhauser* v. *United States, supra.*

We, therefore, hold petitioner is not entitled to deduct the expenditure of $9,453 as a loss under section 165, *supra.*

---

[5] See *Burroughs Bldg. Material Co.* v. *Commissioner*, 47 F. 2d 178, 180 (C.A. 2, 1931), affirming 18 B.T.A. 101; *Squier* v. *United States*, 20 F. Supp. 917 (D.N.J. 1937); *Hales-Mullaly* v. *Commissioner*, 131 F. 2d 509, 512 (C.A. 10, 1942), affirming 46 B.T.A. 25; *Levitt & Sons* v. *Nunan*, 142 F. 2d 795, 798 (C.A. 2, 1944), reversing on another issue a Memorandum Opinion of this Court; *Commissioner* v. *Gilt Edge Textile Corp.*, 173 F. 2d 801 (C.A. 3, 1949), reversing 9 T.C. 543; and *Virginia Hansen Vincent*, 18 T.C. 339, 351, reversed on other grounds 219 F. 2d 228 (C.A. 9, 1955).

In determining whether petitioner is entitled to a deduction under section 212, *supra*, we again must look to the origin and nature of the expenditure. *Arrowsmith* v. *Commissioner, supra; United States* v. *Gilmore, supra; United States* v. *Patrick, supra.* In so doing we see that petitioner, in making the expenditure of $9,453, has in substance merely paid a part of his original liability he assumed in making the 1954 proxy fight. In remitting the amount to Central, he referred to his remittance as "my share of the 1954 proxy fight cost" and in his return he labeled the deduction "Cost of Proxy Fight N.Y. Cent. R.R." We do not think such a payment was one for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. It was made for the purpose of and the hope of becoming a director of Central. In this respect, petitioner's position is much like the lawyer in *McDonald* v. *Commissioner*, 323 U.S. 57, who wanted to become a judge and spent $13,017.27 in trying to be elected as such. The Supreme Court held that McDonald could not deduct the expenditure as an ordinary and necessary business expense, or as a loss, or as an expense for the production of income. To the same effect see *Nichols* v. *United States*, 201 F. Supp. 337 (N.D. Ga.). In its opinion the court said:

> As an alternative to this claim for the deductibility of the $750.00 entrance fee as an ordinary and necessary business expense under Section 162, taxpayer further contends that this expenditure should constitute an expense incurred for the production of income which would be deductible under Section 212 of the 1954 Internal Revenue Code. This position, however, is without merit.
>
> Section 212 did not create a new category of deductible items for expenditures relating to acquisition of future business income. Section 212 was enacted only to permit deductions for expenditures relating to non-business income. *McDonald* v. *Commissioner, supra.* In the *McDonald* case, the taxpayer urged the same contention, and the Supreme Court expressly rejected it.

The facts in *Surasky* v. *United States*, — F. Supp. — (Nov. 8, 1962), are very much like the facts in the instant case. The taxpayer there was a stockholder in Montgomery Ward. During the taxable year 1955 he expended $17,000 to be used in soliciting proxies from other stockholders with the hope of supplanting the existing management of the corporation. He claimed the expenditure as a deduction under section 212 of the 1954 Code. In denying the deduction, District Judge McRae, Jr., said:

> 14. To summarize the facts, the plaintiff herein contributed $17,000 to a committee which was to use the money to solicit proxies from other shareholders of a large, publicly-held corporation, in the hope that the committee would be able to seat a sufficient number of its candidates on the board of directors so that new management policies could be carried out which might result in larger profits and larger dividends to the shareholders.

\*        \*        \*        \*        \*        \*        \*

19. The Court has carefully reviewed the numerous cases cited by the plaintiff in an effort to support his claim and has found them inapposite. Suffice it to say that in the main they concern situations where taxpayers are threatened with a loss of property or position and are required to expend funds to preserve the threatened property or position. The plaintiff here is not threatened with the loss of his Ward stock or a diminution of its value. His expenditure is not proximately related to the production of income or the management of income producing property but is rather made with only a possible expectation of increasing the value of his property through a chain of indirectly connected circumstances. Thus, the cases he relies upon do not lend support to his contention. Indeed, neither party has directed the Court's attention to any authority which could be considered dispositive of the issue presented.

20. The plaintiff's claim does not come within the framework of deductibility established by Section 212 of the 1954 Code. The District Director properly disallowed the claimed deduction. The plaintiff is entitled to no tax refund for the year 1955.

In conclusion, we hold that petitioner is not entitled to deduct the $9,453 under any of the sections 162, 165, or 212. We sustain the respondent's determination.

*Decision will be entered for the respondent.*