NATHAN CUMMINGS AND JOANNE T. CUMMINGS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2653-71. Filed April 23, 1973.

*Anderson A. Owen, Edward W. Rothe,* and *Glen H. Kanwit,* for the petitioners.

*Nelson E. Shafer,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $45,790.18 in the petitioners' Federal income tax for 1962. The only issue for decision is whether the petitioner may deduct as a business expense under section 162(a) of the Internal Revenue Code of 1954,[1] or as a business loss under section 165(a), a payment of $53,870.81 which he made to MGM in 1962 when the Securities and Exchange Commission indicated that he might be liable to MGM for such amount as an insider's profit within the meaning of section 16(b) of the Securities Exchange Act of 1934.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners, Nathan Cummings and Joanne T. Cummings, are husband and wife, who maintained their residence in New York, N.Y., at the time their petition was filed in this case. They filed their 1962 joint Federal income tax return with the district director of internal revenue, Chicago, Ill. Mr. Cummings will be referred to as the petitioner.

During 1962, and since 1940, the principal occupation of the petitioner has been that of chairman of the board and chief executive officer of the Consolidated Foods Corp. (CFC). CFC was founded in 1939 by the petitioner, and it is now a leading processor, canner, and distributor of food products, with present sales of $1.7 billion a year, as compared with sales of $16 million in 1939 and approximately $500 million in 1962.

During 1962, the petitioner was also a director and shareholder of Associated Products, Inc., Rothschild Enterprises, Inc., the College Inn Food Products Co., Monarch Fine Foods, Ltd., Metro-Goldwyn-Mayer, Inc. (MGM), and the Rival Packing Corp. Prior to 1962, the

---

[1] All statutory references are to the Internal Revenue Code of 1954, except that any reference to sec. 16(b) is to such section of the Securities Exchange Act of 1934.

petitioner was a director and shareholder of the Bon Ami Corp., the City Stores Co., and the Kay Woodie Co. Sometime subsequent to 1962, the petitioner was a director and shareholder of the Society Corp., the Western Union Telegraph Co., and the General Dynamics Corp. As a director, the petitioner attended meetings with directors, executive committees, and corporate officers to help improve on activities of the corporation and see that it was well run at a profit.

In 1959, the petitioner was approached with a proposition to purchase a large block of MGM stock. He was told that the corporation was having problems and that if he would become a director, 3 directors who were involved in controversy would resign. Subsequently, the petitioner purchased 51,500 shares of MGM stock at a minimum total cost of $1,030,000, the 3 directors resigned, and the petitioner was elected as 1 of the 15 MGM directors. His purpose in becoming an MGM director was to make a profit by improving MGM's performance. As a director, the petitioner participated actively in MGM's corporate affairs by attending board meetings, by giving the benefit of his judgment on corporate affairs, and by inspecting the corporate properties to determine how they might be better managed.

On April 17, 1961, the petitioner sold 3,400 shares of MGM stock for a total of $227,648.28. The gain realized by the petitioner on this sale was reported as a long-term capital gain on his 1961 Federal income tax return, along with the gains from other sales of MGM stock in March 1961. On various dates from September 18 through October 2, 1961, the petitioner purchased a total of 3,000 shares of MGM stock for a total of $146,960.89. The petitioner was an MGM director throughout 1961.

On January 16, 1962, the Division of Corporation Finance of the Securities and Exchange Commission (SEC) wrote a letter to the secretary of MGM giving its comments on the preliminary material soliciting proxies which MGM had prepared for the annual MGM stockholders meeting to be held on February 23, 1962. It noted that the petitioner had purchased 3,000 shares of MGM stock during September and October of 1961, after having sold a like number within the previous 6 months, and that if he realized:

any material profits from these transactions which under Section 16(b) of the Securities Exchange Act of 1934 inure to and are recoverable by the issuer, the pertinent facts with respect to these transactions should be disclosed in the proxy statement * * *

Section 16(b) of the Securities Exchange Act of 1934 prohibits an "insider," such as a corporate director, from buying and selling or selling and buying, within a 6-month period, the stock of a corporation in which he is an insider. If such a transaction occurs and results in a profit, the corporation should either be paid the profit (commonly

known as the insider's profit) or it should show the profit on its annual report as a debt owed to the corporation. 15 U.S.C. sec. 78p(b) (1970 ed.). The difference between the selling and buying price in this case was $53,870.81.

Upon receipt of the SEC letter, the secretary of MGM immediately informed the petitioner of its contents. The petitioner believed that if any section 16(b) violation had occurred, it had been solely the result of inadvertence. However, so as not to delay the issuance of MGM's proxy statement and so as to avoid the impact which disclosure of his potential section 16(b) liability might have on his business reputation, the petitioner immediately decided to pay MGM $53,870.81. The payment was made on the following day, and as a result, MGM was able to print its proxy statement, which was dated January 18, 1962, without any reference to the insider's profit problem.

On February 1, 1962, the petitioner received from his personal financial assistant a memorandum calling his attention to a situation in which a corporation did not require the insider to make a payment of his section 16(b) profit to the corporation because the violation was inadvertent. On the basis of such memorandum, the petitioner wrote to the secretary of MGM on February 6, 1962, to request a refund of the $53,870.81 payment which he had made. The matter was referred by MGM to independent counsel for an opinion, and such counsel recommended that MGM not make the refund. No refund was ever made.

In 1962, the petitioner received $100,000.16 as his salary from CFC, $89,512 in dividend income from his MGM stock, and $5,000 in director's fees from MGM. He received no other director's fees during 1962.

On their 1962 joint Federal income tax return, the petitioners deducted the $53,870.81 payment to MGM as an ordinary loss, and the respondent determined that such loss was a long-term capital loss.

OPINION

The only issue for decision is whether the petitioner is entitled to deduct the payment which he made to MGM as a business expense under section 162(a) or as a business loss under section 165(a).

This issue first came before this Court in *William L. Mitchell*, 52 T.C. 170 (1969). In that case, the taxpayer was a corporate vice president who had allegedly violated section 16(b), and we found that he was in the trade or business of being a corporate executive and that he made a payment of his alleged insider's profit to the corporation so as to avoid injury to his business reputation, embarrassment to his employer and himself, and the expense of future litigation. We, therefore, held that the payment constituted an ordinary and necessary expense of the taxpayer's trade or business. Our decision in *Mitchell*

was reversed by the Court of Appeals for the Sixth Circuit. 428 F. 2d 259 (C.A. 6, 1970), certiorari denied 401 U.S. 909 (1971).

The issue arose again in *James E. Anderson*, 56 T.C. 1370 (1971), on appeal (C.A. 7, Dec. 23, 1971), in which we thoroughly reconsidered the bases for our holding in *Mitchell* in the light of the reversal of that decision by the Sixth Circuit. With due respect to the views of that circuit court, we again held that a payment made by the taxpayer on account of his apparent violation of section 16(b) was an ordinary and necessary business expense. The taxpayer was a vice president of the Zenith Radio Corp., and we found that he was in the trade or business of being a corporate executive, that the obligation to make the section 16(b) payment arose out of his status as a Zenith employee, and that the payment was made to preserve his employment with Zenith and avoid injury to his busines reputation.

In urging us to hold that the payment made to MGM constituted an ordinary and necessary business expense, the petitioner contends that he was in a trade or business which included being a director of MGM, that his obligation to make the section 16(b) payment arose out of his status as an MGM director, and that the payment was made to avoid injury to his business reputation and to avoid delay in the issuance of the MGM proxy statement. The respondent concedes that the petitioner's activities, separate from his position with CFC, constituted a trade or business. However, he argues that we should overrule our two prior decisions and apply the doctrine of *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952), and conclude as a matter of law that the loss was a capital loss. Alternatively, he contends that the present case is distinguishable from *Anderson* and *Mitchell* because it is unreasonable to conclude as a fact that the petitioner had a business purpose in making the section 16(b) payment.

We decline to overrule our prior decisions. This Court thoroughly considered the applicability of the *Arrowsmith* doctrine in *Anderson* and *Mitchell*, and concluded that the doctrine was not applicable because the section 16(b) payment was not directly and integrally related to the earlier sales transaction which gave rise to the capital gain. In *Mitchell*, we noted the lack of any relationship between the amount of the taxable gain or loss recognized on the sale transaction and the amount of section 16(b) profit which inures to the corporation, and in *Anderson*, we noted that the sale which gave rise to the capital gain was made in the taxpayer's status as a shareholder, while his obligation to make the payment arose out of his status as an employee. Similarly, in the present case, there is a lack of correlation between the amount of capital gain recognized on the sale and the amount of the section 16(b) payment, and the obligation to make the payment arose out of the petitioner's status as a director and not out of his status as a share-

holder. It is true that the petitioner became a director of MGM to enhance the value of his stock in the corporation, but nevertheless, any obligation to pay MGM the insider's profit arose out of his role as a director.

We also reject the contention that there was no overriding business purpose for making the payment to MGM. In *Anderson*, this Court treated the taxpayer as being in the trade or business of being a corporate executive and found that the obligation to make the payment arose out of such trade or business and that the payment was made to protect his business reputation. In this case, it is conceded by the respondent that the petitioner was in a trade or business separate from his activities with CFC, and his activities as a director of MGM were clearly a part of that trade or business so that the obligation to make the payment arose out of a trade or business. Thus, in this case, we are not presented with a situation in which being a director was not part of a trade or business of the taxpayer. See *R. Walter Graham, Jr.*, 40 T.C. 14 (1963), reversed on another point 326 F. 2d 878 (C.A. 4, 1964); cf. *Carl F. Fayen*, 34 T.C. 630 (1960); *Stephen H. Tallman*, 37 B.T.A. 1060 (1938).

Furthermore, we find that the payment was made to protect the business reputation of the petitioner and to avoid delay in the issuance of the MGM proxy statement. The respondent suggests that the petitioner made the payment merely because he was required to do so as a matter of law and contends that the disclosure of an apparently innocent violation of section 16(b) would not have blemished the petitioner's business reputation. Yet, the petitioner could not control the reporting of the circumstances to the business community; and it was not unreasonable for the petitioner to believe that his business reputation, which he considered to be his most important asset, might be damaged by incomplete reporting, by people not completely understanding the circumstances, or by mere association with an alleged securities violation. In addition, the timing of the events supports the petitioner's statement as to his reasons. Immediately after learning about the problem, he agreed to make the payment to MGM, and clearly there was insufficient time for him to have secured considered legal advice as to his liability to MGM. If he had made the payment because of a belief that he was required to do so, he surely would have sought such legal advice, and more time would have been required to secure such advice and to make a decision based upon it.

Both payments made to protect a taxpayer's business reputation (*James E. Anderson, supra; William L. Mitchell, supra; Laurence M. Marks*, 27 T.C. 464 (1956); *Paul Draper*, 26 T.C. 201 (1956)), and payments made in settlement of mismanagement claims arising out of

the taxpayer's trade or business (*William L. Butler*, 17 T.C. 675 (1951); *Great Island Holding Corporation*, 5 T.C. 150 (1945); *John Abbott*, 38 B.T.A. 1290 (1938)), have been held to be ordinary and necessary business expenses. Furthermore, in *William L. Mitchell*, we allowed a deduction where the payment was made to avoid injury to the taxpayer's business reputation and embarrassment to the involved corporation. For similar reasons, we hold that the payment made in this case is deductible as an ordinary and necessary business expense.

*Decision will be entered for the petitioners.*

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.